No. 49,069

STATE OF KANSAS, *Appellee,* v. THOMAS LEO McCORGARY, *Appellant.*

(585 P.2d 1024)

Opinion filed October 28, 1978.

*Richard L. Hilton* and *Ernest Moulos,* both of Wichita, argued the cause and were on the brief for the appellant.

*Stephen E. Robison,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, *Vern Miller,* district attorney, and *Stuart W. Gribble,* assistant district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: Thomas Leo McCorgary was convicted of killing Earl Bowlin, Ruth Bowlin and Wayne Platt. These three murders occurred in 1963. McCorgary was not prosecuted until ten years later. Jury verdicts of guilty were returned on all three counts of murder in the first degree on June 12, 1974. This appeal followed.

At the outset a few facts should be given. The Bowlin murders were particularly gruesome killings. Earl Bowlin was found shot in the living room of his farm home. Four bullet wounds were in his head and one in his chest. A smeared trail of blood led from

inside the house to the front porch. This convinced the investigating officers that the missing wife, Ruth Bowlin, had also been killed. The torso of Ruth Bowlin's body was found in a shallow grave under some trees about three quarters of a mile from the Bowlin farm home.

Wayne Platt, the operator of a service station, was killed a few days later on the outskirts of Wichita. The station was in the general area a person would traverse to reach the city of Wichita after leaving the Bowlin farm. Platt was found in the restroom of his service station. He had been shot with a .45 caliber weapon. It was not until ten years later that a connection between these murders was discovered. We will develop additional facts as they become pertinent to a discussion of the points raised on appeal.

The first point raised by appellant McCorgary concerns the testimony of David Elliott, a police informer and a cell mate of McCorgary while in the Sedgwick County jail in March of 1973. McCorgary then had been charged and was later convicted of the murder of Karl Williams. The Williams conviction was reversed by this court and remanded for a new trial. See *State v. McCorgary*, 218 Kan. 358, 543 P.2d 952 (1975), *cert. denied* 429 U.S. 867, 50 L.Ed.2d 147, 97 S.Ct. 177 (1976). (McCorgary was retried and was convicted a second time for the Williams murder. His conviction was upheld in an unpublished opinion of this court.) In order to understand the point raised in the present case the cause of the reversal in the Williams conviction must be understood. The case was remanded for a new trial because of the improper use of the testimony of David Elliott, a police informer. We held in that case the state violated McCorgary's right to counsel by surreptitiously placing the police informer in a cell with appellant in order to obtain information on the Williams murder through questioning by the police informer. We held the police could not do indirectly what they could not do directly, *i.e.,* interrogate McCorgary in the absence of his attorney or without a knowing waiver of his right to have counsel present during questioning. Our holding in this regard was based upon *Massiah v. United States,* 377 U.S. 201, 12 L.Ed.2d 246, 84 S.Ct. 1199 (1964).

When the incriminating statements were made to Elliott on the Karl Williams murder McCorgary was being held on the Williams charge. However, at that time in addition to the incriminating

statements on the Williams murder, McCorgary confessed to the killing of Earl Bowlin, Ruth Bowlin and Wayne Platt. These murders had occurred ten years before. McCorgary was not under indictment and no charges had been filed on these killings at the time he voluntarily confessed to Elliott. The confession was not made as a result of any surreptitious questioning by Elliott as to the circumstances of the Bowlin and Platt deaths.

Elliott was permitted to testify in the present case as to the incriminating statements made by McCorgary which amounted to a verbal confession that he killed the Bowlins and Wayne Platt ten years before.

The appellant contends the admission of the testimony of Elliott resulted in reversible error. He urges error on two separate grounds. The first is a Fifth Amendment argument that since Elliott was acting as a police agent during the time in question he was required to advise appellant of his constitutional rights in accordance with *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974 (1966). This would appear to be the first case in which this court has been called upon to consider the application of *Miranda* to the use of undercover agents or informers in a custodial setting. The question has, however, been considered by several federal courts. The federal courts have held *Miranda* inapplicable under the present circumstances.

The first of these cases is *United States v. Fioravanti,* 412 F.2d 407, 413-414 (3rd Cir.), *cert. denied* 396 U.S. 837, 24 L.Ed.2d 88, 90 S.Ct. 97 (1969). This was an appeal from a conviction in a federal counterfeiting case. The government's case was based largely on the testimony of a secret service agent who had worked undercover. For a short time after the defendants were arrested they were held in a detention room along with the agent whose true identity was still undisclosed. During this time the appellant made an incriminating statement which came out at trial while the agent was being cross-examined by defense counsel. The court held the statement to be admissible at trial despite the absence of the *Miranda* warnings. In so holding the court made the following observations:

"Here, it is inconceivable that the defendant could have experienced the coercion-born type of fear and intimidation set forth in *Miranda,* because when he volunteered this incriminatory statement, he thought that he was conversing with a fellow partner in crime, not a policeman. The predicate of *Miranda* is the

inherently coercive nature of police interrogation of a person in custody; it cannot have application to a situation where one, not under stress of interrogation, simply volunteers a statement which perchance turns out to be inculpatory." 412 F.2d at 413-414.

See also *United States v. DiLorenzo,* 429 F.2d 216, 219-220 (2nd Cir. 1970); *United States v. Viviano,* 437 F.2d 295, 300-301 (2nd Cir.), *cert. denied* 402 U.S. 983, 29 L.Ed.2d 149, 91 S.Ct. 1659 (1971).

In *Hoffa v. United States,* 385 U.S. 293, 17 L.Ed.2d 374, 87 S.Ct. 408 (1966), *reh. denied* 386 U.S. 940, 951, 17 L.Ed.2d 880, 87 S.Ct. 970 (1967), the exact situation presented here was considered by the United States Supreme Court. The question there framed was whether evidence obtained by the government by means of deceptively placing a secret informer in the quarters and councils of the defendant during one criminal trial so violated the defendant's constitutional rights that suppression of such evidence was required in a subsequent trial of the same defendant on a different charge. The court in *Hoffa* answered the above question in the negative. The court pointed out that none of the incriminating statements which the informer heard were made in the presence of counsel, in the hearing of counsel, or in connection in any way with the legitimate defense of the second crime. The defendant was not in custody or charged with the second crime about which defendant volunteered his statements. The court declined to exclude the testimony of the informer as to the incriminating statements relevant in the subsequent case. It stated there was nothing in *Massiah,* in *Escobedo,* or in any other case which would render such testimony by the informer a violation of defendant's Fifth or Sixth Amendment rights.

Although state action in obtaining evidence by surreptitiously placing an informer in a cell with defendant during a criminal prosecution may violate defendant's constitutional rights in a pending case, such action does not require suppression of other evidence volunteered at the same time by defendant pertinent in a subsequent prosecution on an entirely different charge. See *United States v. Gray,* 565 F.2d 881 (5th Cir. 1978); *Grieco v. Meachum,* 533 F.2d 713 (1st Cir.), *cert. denied* 429 U.S. 858, 50 L.Ed.2d 135, 97 S.Ct. 158 (1976); *United States v. Missler,* 414 F.2d 1293 (4th Cir. 1969), *cert. denied* 397 U.S. 913, 25 L.Ed.2d 93, 90 S.Ct. 912 (1970); *Gascar v. United States,* 356 F.2d 101 (9th Cir. 1965), *cert. denied* 385 U.S. 865, 17 L.Ed.2d 92, 87 S.Ct. 125

(1966); *United States v. Edwards,* 366 F.2d 853 (2nd Cir. 1966), *cert. denied* 386 U.S. 908, 17 L.Ed.2d 782, 87 S.Ct. 852 (1967).

Appellant's next point concerns the admission into evidence of photographs and a movie film depicting the scenes where the bodies of the Bowlins were found. Several pictures were taken of the gruesome and grotesque mutilation of the body of Ruth Bowlin. These showed the body as it appeared when it was removed from the shallow grave. It is contended the exhibits were prejudicial to defendant's rights since the pictures are described as "highly inflammatory to the passions of the jury."

We have viewed the photographs and the color movie film. The only pictures which are objectionable are those of Mrs. Bowlin's decapitated head. There are five slightly different views of the head. These five photographs are objectionable because of the unnecessary repetition. The trial court found all these exhibits relevant to show the crime scenes and physical evidence. The pictures were proper for those purposes. The extent, nature and number of wounds inflicted are generally relevant in a first degree murder case. The unnecessary repetition of the pictures of the decapitated head is not enough in this case to justify a reversal.

Photographs and color film are not inadmissible as evidence merely because they may be gruesome and shocking provided they are true reproductions of relevant physical facts and conditions material to matters in issue. *State v. Childers,* 222 Kan. 32, 44-45, 563 P.2d 999 (1977); *State v. King,* 219 Kan. 508, 513, 548 P.2d 803 (1976).

Appellant's third point of error is based upon a claim of lack of evidence available for his defense caused by the eleven year lapse of time between the crime and the time of trial. Several subpoenas for witnesses were returned "not found." This establishes nothing without a showing of what these witnesses could be expected to establish by their testimony. Appellant complains of inability to find alibi witnesses. Complaint is also made because of the death of one of the police officers who was present when appellant made incriminating statements. The complaint of inability to find alibi witnesses was general in nature. As to the death of the police officer, the voluntary nature of appellant's statements was established and the death of one of several police officers present at the time the statements were made without pointing out something more specific can hardly support a charge of

prejudice and unfairness. The one matter appearing in appellant's argument which could possibly have caused prejudice to a defense bears on a possible plea of not guilty by reason of insanity. The appellant had been adjudicated insane four years before these crimes were committed. It is possible the time between 1963 and 1973 may have played a part in counsel's decision not to plead insanity in 1973. However, whether prosecution was in 1963 or 1973 the defense would relate to appellant's mental condition in 1963 when the crime was committed. The four year period before the crime would remain the same regardless of when appellant was prosecuted.

Appellant asserts that this delay prior to commencing the criminal prosecution denied him due process of law. Appellant cites *United States v. Marion,* 404 U.S. 307, 30 L.Ed.2d 468, 92 S.Ct. 455 (1971), to support this contention.

The United States Supreme Court has held that the speedy trial clause of the Sixth Amendment is inapplicable to preindictment delay. *United States v. Marion,* 404 U.S. at 320. This court has reached the same holding with regard to § 10 of the Bill of Rights of the Kansas Constitution. *State v. Trotter,* 203 Kan. 31, 453 P.2d 93 (1969). Therefore, if appellant's contention is to prevail he will have to show a violation of the due process clause. This question is governed by the recent case of *United States v. Lovasco,* 431 U.S. 783, 52 L.Ed.2d 752, 97 S.Ct. 2044 (1977). In that case an indictment was returned some 18 months after the offense was allegedly committed. The defense attempted to establish prejudice by showing the delay caused the loss of two defense witnesses. According to the government the delay resulted from their attempt to uncover additional perpetrators. The lower courts concluded that the delay was unjustified, unnecessary, and unreasonable and that the due process clause barred prosecution. The supreme court reversed. The supreme court holds "that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." 431 U.S. at 796. A showing of prejudice while necessary to support a due process claim is not sufficient in itself. Rather, "a due process inquiry must consider the reasons for the delay as well as the prejudice of the accused." The court did, however, state in dicta that governmental delay solely "to gain tactical advantage over the accused"

would violate due process. 431 U.S. at 795. A like pronouncement is made in *United States v. Marion,* 404 U.S. at 324.

This same conclusion was reached by this court in *State v. Royal,* 217 Kan. 197, 202, 535 P.2d 413 (1975), where we concluded:

"[T]wo questions must be considered in testing whether there has been an impermissible encroachment on due process rights: (1) Has the delay prejudiced the accused in his ability to defend himself, and (2) was the delay a tactical device to gain advantage over him? Affirmative answers to both questions need be supplied before it may be said that criminal charges should be dismissed."

The speedy trial requirement of the Sixth Amendment of the United States Constitution which is also guaranteed by § 10 of the Bill of Rights of the Kansas Constitution is inapplicable to a preindictment delay, except when the governmental delay is solely for the purpose of gaining tactical advantage over the accused in which case there may well be a due process violation. From what has been said it is clear that if appellant is to prevail on this point he must show not only that he was prejudiced by the delay, but also that the delay was due solely to an attempt by the state to gain a tactical advantage over him. The appellant clearly has not established this. The state gave the following explanation of the delay at trial:

"However, [defense] counsel states that we had all the information in 1963; we did not. The later part of 1963, if my memory serves me correct, we had information from a prisoner as to statements made by the defendant about the Bolin [*sic*] murder case and the other case, Platt. In 1965, if my memory serves me correct, there was a statement made to another prisoner; it was not detailed, it was not what I would call sufficient to base in a review of the evidence that we had back eleven years ago. I don't think it was sufficient, and I don't think we had at that time sufficient evidence to issue a warrant for murder one. In 1973, there came to light, during the course of another investigation concerning this defendant, another murder, another statement of another prisoner. During that statement, it went into detail—or the defendant went into detail with this prisoner concerning two murders, that being Williams and that being the Bolin [*sic*] case. The body was subsequently found on the Williams case and it, through the processes, the defendant was arrested on the Williams case and went to trial. A review of that case and a review of the statements of the prisoner incarcerated with the defendant, the other two prisoners and what other information we had from 1963 in our opinion warranted the filing of a murder one, warrants on three cases, that being Wayne Platt, and the two Bolin's [*sic*], Earl and Ruth."

An examination of the record supports the state's explanation. McCorgary's confession to Elliott in 1973 was an important, if not an indispensable, part of the state's case. The state acted

properly in not bringing charges before that time and acted with due speed after that time. There is not the slightest indication the delay was a ploy by the state "to gain a tactical advantage over the accused."

The appellant for his fourth claim of error argues he was deprived of a fair trial by the admission in evidence of his conviction on the Karl Williams murder charge. The evidence of the offense was admitted pursuant to K.S.A. 60-455 to show motive, intent, preparation and plan. Evidence was introduced at a separate hearing to show the similarities between the Williams murder and the Bowlin murders. The state's argument on the motion *in limine* serves to point out the claimed similarities. The assistant district attorney argued as follows:

"MR. PETERS: Your Honor, the facts of the Williams case are so closely related in this case—If I might give the Court a short historical background of how this case came to light in relation to the Williams case. The Williams case was being originally started, I should say as a missing person's report in the Wichita Police Department by a sister of Carl Williams some time in, if I remember, the summer of 1973—was it not?

"MR. HILTON: 1972.

"MR. PETERS: You are correct. She made several trips to the city of Wichita. On the last trip she had opportunity to talk to Captain Floyd Williamson of the Wichita Police Department concerning the disappearance of her brother; and he went into some detail in the conversation concerning who Carl Williams associated with, and she mentioned the name of Tom and a name that began with Mc, but she couldn't remember the entire name; and she was asked by Captain Williamson if it was McCorgary, and she said yes that was him. Captain Williamson was familiar or knew of McCorgary's involvement or the investigation involving the Bowlin trial. The case was ultimately assigned to Detective Drowatzky who from that standpoint worked it up and made various inquiries in various penal institutions of the United States concerning prisoners that McCorgary talked to over the years, one being Alex Cox in 1963 and Larry Dohle in 1965; and in Captain Williamson's recommendation, David Elliott was placed in 1973 in the same cell and the Court has heard the information that he received. The information received concerned both the Bowlins and their death and also Carl Williams. The case was filed without a body having been discovered some time in 1973—the exact date I can't remember which—I believe—

"MR. HILTON: March.

"MR. PETERS: Yes, March of 1973, the body was shortly thereafter discovered basically from the media covering the case being filed without a body, and it was found in a wooded area behind Pinsker Steel in a very shallow grave, so shallow in fact, a skeletized portion of a hand was above ground. The body according to the coroner's report of Carl Williams' death was caused by—and I believe the terms he used—a massive oppression blow to the skull. The testimony revealed that there was an immense amount of blood on the defendant after he

killed Carl Williams. We believe that—and the defendant was convicted in, I think of October of 1973 of second-degree murder and aggravated robbery of Carl Williams.

"The case we have at hand, the body of Mrs. Bowlin was disposed of in a very very shallow grave. It is an immense bloody killing as evidenced from the interior of the house and the blood. The body was dismembered. The disposal of the body from statements was to hamper or preclude identification of the body as we believe the reason for the burial in behind Pinsker Steel in a remote desolate area was the motive we believe from statements of the defendant was the robbery of the Bowlin family from the sale of livestock and monies; the motive we believe of Carl Williams was robbery in that the pockets—in the body as it was assumed [*sic*] and I refer to the Williams killing—pockets of his trousers were all turned out indicating a robbery motive. The car of Carl Williams was taken, also a robbery motive, and he was convicted of that robbery.

"The cases we feel, Your Honor, are similar in the fact of a brutal killing, the disposal of the bodies in shallow graves in remote desolate areas, robbery always being present as a motive, and modus operandi. We believe that the Williams case is an offense similar to the Bowlin case for that reason methods of operation being—If I might look over the Court's shoulder—preparation and plan, modus operandi are methods of operation is included in preparation and plan. We think intent is another similarity in the two cases that the intent being to murder.

"The remarks of the defendant, of statements have always been that you don't leave live witnesses when you rob. We feel that that is also applicable to the Platt case, that robbery was the motive and the old saying: Dead men don't tell no tales. Being applicable, for that reason, we feel not only should we be allowed to mention the similarities on opening statement, but to present evidence to the testimony of Detective Drowatzky and the Court's files of that conviction."

Much has been written concerning the use of the exceptions in K.S.A. 60-455. The case annotations following the statute attest to this fact. The motive exception under the statute is explained and applied in *State v. Craig,* 215 Kan. 381, 383, 524 P.2d 679 (1974). Motive for the Bowlin murders could hardly be shown by proof of the Williams murder eleven years later.

The intent exception was urged; however, intent was not substantially in issue. The Bowlin and Platt killings were done intentionally and this was not questioned at trial. Insanity was not raised as an issue at trial. The felony murder charges made it unnecessary to prove state of mind such as deliberation, premeditation, and malice. The meaning of preparation and plan was explained in *State v. Marquez,* 222 Kan. 441, 446-447, 565 P.2d 245 (1977). The Williams murder, occurring some ten years after the Bowlin and Platt murders, clearly could not have been in preparation for or part of the plan for the earlier Bowlin and Platt murders.

For the reasons stated the trial court did err in admitting the evidence of the subsequent crime under the exceptions instructed upon. However, there was an issue of the identity of the perpetrator of the Bowlin and Platt murders. The fact that the Williams murder occurred subsequent in time to the offenses being tried does not affect its admissibility to establish identity. *State v. Morgan,* 207 Kan. 581, Syl. 2, 485 P.2d 1371 (1971); *State v. Miller,* 204 Kan. 46, 48, 460 P.2d 564 (1969). If evidence of other crimes is otherwise admissible, remoteness in time of the other offenses affects only the weight and probative force and not the admissibility of the evidence. *State v. O'Neal,* 204 Kan. 226, 461 P.2d 801 (1969).

The admission of evidence of the other crime and the instruction of the court authorizing and limiting that evidence to motive, intent, preparation and plan was clearly in error. Under the balancing procedure suggested in *State v. Bly,* 215 Kan. 168, Syl. 3, 523 P.2d 397 (1974), the evidence of the other crime should not have been admitted even on the question of identity. The probative value and force of the evidence of the Williams murder pointing to the defendant and identifying him as the perpetrator of the Bowlin and Platt murders was not strong. When weighed against the tendency to prejudice the jury it should have been excluded. The question then is whether its admission can be considered harmless beyond a reasonable doubt.

The erroneous admission of evidence of a crime under one exception in K.S.A. 60-455 is not made harmless merely by the fact it would have been admissible under another exception not instructed on. *State v. Marquez,* 222 Kan. at 447-448. Therefore, the court must examine the whole record to see whether the admission of the evidence was harmless or prejudicial under the harmless error rule. See *State v. Thompson,* 221 Kan. 176, Syl. 5, 6, 558 P.2d 93 (1976), for the harmless error rule and its application.

We consider the evidence against the appellant in this case to be overwhelming. Appellant told three different cell mates he killed Earl Bowlin, Ruth Bowlin and Wayne Platt. He made these incriminating statements on three separate occasions. The circumstances under which these incriminating statements were made lend credence to the state's claim of voluntariness. All three of the cell mates testified at this trial. McCorgary's cap was found

near the place where Ruth Bowlin's body was found. This was physical evidence tying him to the crimes. Other evidence pointed to McCorgary. Footprints at the Bowlin farm matched those near where Ruth Bowlin's pocket book was found. McCorgary's story that he first washed and then burned his car to destroy traces of human blood was verified by the police. This case against appellant did not arise from a single murder. The prosecution was for three murders. The other-crime evidence of the Williams murder was tied into the Bowlin and Platt murders by reason of the testimony of the police informer Elliott. For these reasons the evidence of the Williams crime lost some, if not most, of its prejudicial impact. The evidence of guilt in the present case is of such direct and overwhelming nature it can be said the erroneous admission of the Williams evidence could not have affected the result of the trial. Such admission of other-crime evidence is harmless error.

The final point raised by appellant concerns a failure of the trial court to declare a mistrial after Mrs. Kelley, a prospective juror on *voir dire*, expressed a strong feeling in front of other prospective jurors that what she had read in the paper about these murders was true. She was a cousin of the appellant and was excused from jury service. Appellant made no contemporaneous objection. However, a motion for mistrial was filed by appellant before *voir dire* was completed. The motion was denied but the jury was admonished to disregard statements by prospective jurors. They were further admonished not to consider what they may have read in newspapers.

K.S.A. 22-3423(c) covers grounds for a possible mistrial in this case. This subsection provides: "Prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution; . . ." The granting of a mistrial on this ground lies within the discretion of the trial court. *State v. Jakeway,* 221 Kan. 142, 148, 558 P.2d 113 (1976). A mistrial will not be declared under K.S.A. 22-3423(c) unless the rights of either the defendant or the state have been substantially prejudiced. *State v. Rhodes,* 219 Kan. 281, 283, 546 P.2d 1396 (1976). No such showing has been made in this case. The statements of Mrs. Kelley were inadvertent and it is conceded that no intentional action by the state precipitated these improper statements.

The judgment is affirmed.

PRAGER, J., concurs in the result.