No. 54,517

STATE OF KANSAS, *Appellee,* v. ROBERT G. GARCIA, *Appellant.*

(664 P.2d 1343)

Opinion filed June 10, 1983.

*Stephen E. Robison,* of Joseph, Robison & Anderson, of Wichita, argued the

cause, and *Charles E. Millsap,* of the same firm, was with him on the brief for the appellant.

*Geary N. Gorup,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Clark V. Owens,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict finding Robert G. Garcia (defendant-appellant) guilty of three counts of first-degree murder (K.S.A. 21-3401) and one count of aggravated battery. (K.S.A. 21-3414.)

The evidence disclosing how the crimes were committed is essentially undisputed. The appellant spent the evening of November 16, 1981, at the home of Maria Robles at 928 North Doris, Wichita, Kansas. The appellant had occasionally dated Maria. Living with Maria at this time were her four-year-old son, Gabriel Longeria; Cecil Browning and her fifteen-year-old daughter, Aimee Uffner; and Karen Neil. The appellant wanted Maria to go out with him that night, but she declined, explaining that she and Karen had made plans for the evening.

During the evening the appellant worked on Cecil's car and then ate dinner with all the residents of the house. After dinner Aimee played the piano and everyone sang songs. Around 10:30 Cecil left the house to go out of town with her boy friend. The appellant continued to stay at the house although Karen and Maria told him they had to leave. Finally, around midnight, Maria and Karen left the house and the appellant departed in his car.

Maria and Karen returned home around 2:45 that morning. Aimee, who had been looking after Gabriel, was watching television. The three were sitting in the living room talking when the appellant knocked on the door. He was carrying a 12-gauge shotgun and told Maria "he ought to beat the shit out of her." The four of them sat in the living room for a while with the appellant holding the shotgun. At one point when Karen stood up and said she had to use the bathroom, the appellant pointed the gun at her and told her to sit down.

At Aimee's insistence the appellant unloaded the gun and briefly rested it against the wall. He then ordered everyone into the kitchen and reloaded the gun. Maria went into one of the bedrooms to check on Gabriel and refused to come to the kitchen

to talk to the appellant unless he again unloaded the gun. He complied, and they talked at the kitchen table for a few minutes. Meanwhile Karen got Gabriel from his bed because he was crying. While the appellant was at the house he had two drinks. After everyone returned to the living room the appellant said he "was going to take [his] glass with him because it would leave fingerprints," and "the biggest mistake he could make would be to have any sympathy for the victims because it would leave a witness, and he would get caught."

Aimee again pleaded with the appellant to put the shotgun away. The appellant replied, "Say your prayers for me," and then said, "No, say them for yourself," and began loading the gun. Standing only a few feet away from the victims he began shooting, hitting Gabriel in the face with the first shot, Karen Neil with the second shot, and finally shooting Aimee and Maria each twice. The appellant then sarcastically said "goodbye" and left the house. Karen, who received wounds to her right hand and face, was able to get to a neighbor's house for help. Gabriel and Aimee were found dead at the scene and Maria died later at the hospital from her wounds. Karen Neil survived but lost three fingers on her right hand. She testified at trial concerning the above-related circumstances surrounding the event.

The appellant was charged with three counts of first-degree murder and one count of aggravated battery to which he pled not guilty by reason of insanity. The appellant had been admitted to the Veterans Administration Hospital in Wichita in February 1981, as a result of a suicide attempt. He had a history of several previous attempts. Dr. R. L. Stegman, a clinical psychologist, and Dr. Santharam Yadati, a psychiatrist, participated in the appellant's treatment during the appellant's hospitalization and testified on his behalf at trial. Dr. Stegman testified that tests performed on the appellant indicated that he was not psychotic, that he was depressed at the time of his discharge in March 1981 but was not considered to be dangerous to others, and that he knew the difference between right and wrong and the nature and quality of his acts. Dr. Stegman continued to see the appellant on an outpatient basis until October 23, 1981. Dr. Yadati testified he did not consider the appellant to be psychotic, or a danger to others. At the time of the appellant's discharge in March 1981, Dr. Yadati diagnosed the appellant as having atypical depression

and a passive/dependent personality. He also considered the appellant to be psychologically unemployable.

Another clinical psychologist, Dr. Theodore Moeller, interviewed the appellant three times following the killings and performed a variety of clinical psychological tests on him. He testified that his evaluation of the appellant showed evidence of emotional disorganization and schizophrenia, as well as a strong possibility of psychosis. From his evaluation he determined the appellant did not know the nature and quality of his actions and was unable to judge right from wrong on the night of the killings because his judgment was impaired when he was under stress.

The appellant was convicted of each charge. He raises numerous trial errors on appeal. He first contends the trial court erred in admitting into evidence six color photographs depicting the scene of the crime and various wounds suffered by the victims. The first photograph shows the living room of the house with the bodies of two of the victims visible. While some blood is apparent on the carpet, furniture and a blanket, the injuries to the victims cannot be seen. Two other photographs were also taken in the house and show the blood-covered body of Aimee Uffner, with the feet of Gabriel Longeria visible, and the mangled, blood-covered face of Gabriel Longeria. The other three photographs were taken at the hospital. One shows the blood-covered face of Karen Neil, another shows her dismembered right hand, and the third depicts a large gaping wound to Maria Robles' shoulder and the bloody side of her face.

In a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome. See, e.g., State v. Green, 232 Kan. 116, 118, 652 P.2d 697 (1982), and cases cited therein. Even where the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged; and photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. State v. Campbell, 210 Kan. 265, 276, 500 P.2d 21 (1972); State v. Dargatz, 228 Kan. 322, 329, 614 P.2d 430 (1980); State v. Henson, 221 Kan. 635, 647, 562 P.2d 51 (1977). Photographs depict-

ing the extent, nature and number of wounds inflicted are generally relevant in a first-degree murder case. *State v. McCorgary,* 224 Kan. 677, 681, 585 P.2d 1024 (1978). Photographs are erroneously admitted when they are unduly repetitious, gruesome, and add nothing to the State's case. *State v. Dargatz,* 228 Kan. at 329; *State v. Henson,* 221 Kan. at 647; *State v. Clark,* 218 Kan. 18, 24, 542 P.2d 291 (1975).

Relying on *State v. Boyd,* 216 Kan. 373, 532 P.2d 1064 (1975), the appellant contends the photographs were not necessary to the State's case,. were unduly repetitive, and offered solely to prejudice the minds of the jury. The appellant maintains the testimony by the witnesses which vividly described the scene of the crime and the victims' injuries was not challenged, thus eliminating the need for corroboration. In *Boyd,* fourteen photographs of the body of the victim taken at an autopsy were offered by the State. The court held that while some of the photographs were helpful in explaining the victim's wounds to the jury, the trial court abused its discretion in admitting repetitious photographs, and in particular a picture of the body of the deceased "cut open from chin to groin and laid out like a disemboweled beef in a packing plant." 216 Kan. at 377.

The photographs admitted into evidence here were not repetitious. Each photograph depicts a different view of the scene, or a different victim or wound. In fact, the trial court excluded several photographs which were duplicitous of those admitted. The photographs which were admitted served to corroborate the testimony of Karen Neil concerning the location of the victims and the appellant at the time of the shooting and the various shots fired. They also corroborate the testimony of the pathologist regarding the nature and extent of the various wounds to the victims. The photographs illustrate the violence of the crime, the severity of the wounds, the lack of randomness in the shootings, the size of the room where the shooting occurred and the locations of the victims, all of which directly relate to the elements of malice and premeditation. Although the photographs are not pleasant to view, they were highly relevant to the State's case. Nothing of a prejudicial nature was introduced merely to inflame the jury, and we find no error in the admission of these photographs.

The appellant next contends the trial court violated his right to

be present at all stages of the trial as provided by K.S.A. 22-3405(1) and the Sixth Amendment to the United States Constitution. Following the noon recess on the fifth day of trial it was brought to the court's attention that the appellant had become "emotionally overwrought." The court was concerned with the appellant's ability to assist in his defense and ordered a continuance so a determination regarding his competency could be made. These findings were made outside the presence of the jury. Over defense counsel's objection the court ruled that "in view of the Defendant's obvious reactions," the appellant would be removed from the courtroom before the jury was brought in and excused for the weekend recess. The jury was informed that a matter had arisen necessitating a continuance, given the normal admonitions, and excused. The following Monday the court learned the results of the appellant's examination would not be available until Wednesday. The record reflects only that the appellant was not present but was represented by his attorney. No objection was raised concerning the appellant's absence. The jury was brought into the courtroom and informed that the matter necessitating the continuance was unresolved and the case would be continued to Wednesday. The court then conversed with a member of the jury concerning a funeral which the juror wanted to attend and the jury was excused.

The trial commenced on Wednesday, at which time the court found the appellant competent to stand trial, commenting that the appellant appeared "to be in much more presentable and . . . stable condition today than he did on Friday when we took a recess."

K.S.A. 22-3405 concerns the presence of a defendant in a criminal prosecution, and provides in part:

"(1) The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law. In prosecutions for crimes not punishable by death, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict."

In *State v. Mantz*, 222 Kan. 453, 463, 565 P.2d 612 (1977), we construed K.S.A. 22-3405 to mean that a criminal defendant must be present at all times when the jury is present in the courtroom, except when the defendant is voluntarily absent, as set forth in the statute. We recognized the general rule that the defendant's

statutory and constitutional rights are violated only if the defendant is absent when the jury is hearing the case or when he is prevented from attending such other proceedings where his presence is essential to a fair and just determination of a substantial issue. The defendant's rights to be present, however, do not encompass proceedings before the court involving matters of law. In *Mantz* it was held the defendant's right to be present under K.S.A. 22-3405 was not violated by an in-chambers conference between the court and counsel in the absence of the defendant concerning instructions, as the conference involved only matters of law and was not a "stage of the trial" within the meaning of the statute. Similarly, no error was found in *State v. Sanders,* 227 Kan. 892, 893-94, 610 P.2d 633 (1980), where the defendant complained of a conference concerning motions in limine at which he was not present. In *State v. Sandstrom,* 225 Kan. 717, 595 P.2d 324, *cert. denied* 444 U.S. 942 (1979), we held there was no violation of the defendant's right to be present where she was voluntarily absent from two hearings before the court. In *State v. Nelson,* 223 Kan. 251, 253, 573 P.2d 602 (1977), we held the presence of a defendant is not required by K.S.A. 22-3405 during an evening recess in the trial proceedings at which time a juror is granted permission to visit a sick relative, and the court may declare a continuance to assure the return of the juror when no prejudice to the defendant's rights are shown. On two occasions the Court of Appeals has held error was committed when the trial court allowed testimony to be read back to the jury during its deliberations in the absence of the defendant. See *State v. Antwine,* 4 Kan. App. 2d 389, 400-01, 607 P.2d 519 (1980); *State v. Gammill,* 2 Kan. App. 2d 627, 631, 585 P.2d 1074 (1978).

The United States Supreme Court held in *Illinois v. Allen,* 397 U.S. 337, 25 L.Ed.2d 353, 90 S.Ct. 1057, *reh. denied* 398 U.S. 915 (1970), that the Sixth Amendment guarantees a defendant the right to be present at every stage of trial.

"The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .' We have held that the Fourteenth Amendment makes the guarantees of this clause obligatory upon the States. *Pointer v. Texas,* 380 U.S. 400 (1965). One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." 397 U.S. at 338.

This rule includes the defendant's right to be present whenever the court communicates with the jury. *Shields v. United States*, 273 U.S. 583, 71 L.Ed. 787, 47 S.Ct. 478 (1927). Most federal courts have held that where the defendant's constitutional right to be present is violated, such error is harmless and does not require reversal where there is no reasonable possibility of prejudice from the error. See 3A Wright, Federal Practice and Procedure: Criminal 2d § 724, p. 31 (1982); *Jones v. United States*, 299 F.2d 661, 662 (10th Cir.), *cert. denied* 371 U.S. 864 (1962). This court has held that in applying the harmless error rule in line with state and federal constitutional requirements, a court must be able to declare the error had little, if any, likelihood of having changed the result of the trial and the court must be able to declare such a belief beyond a reasonable doubt. *State v. Johnson*, 231 Kan. 151, Syl. ¶ 7, 643 P.2d 146 (1982). It is the defendant's burden on appeal not only to show error, but further to establish that the error resulted in substantial prejudice to his rights. *State v. Holt*, 223 Kan. 34, 45, 574 P.2d 152 (1977).

In the present case the appellant had a right under K.S.A. 22-3405 and the Sixth Amendment to be present in the courtroom when the jury was informed of the continuance and admonished prior to being excused. The trial court thus erred in having the appellant removed before the jury was brought in. The appellant contends this error was prejudicial to him because it would have aided his insanity defense for the jury to see him in an unstable condition. This argument is not persuasive because there is a distinction between the defendant's competency to stand trial and the issue of the defendant's legal insanity at the time of the commission of the crime. The former concerns the defendant's ability to understand the nature and purpose of the proceedings against him and to assist in making his defense *at the time of trial* (see K.S.A. 22-3301), whereas the latter concerns evidence of mental disease or defect suffered by the defendant *when the crime was committed,* which impaired his ability to judge right from wrong. See, *e.g., State v. Buckner,* 221 Kan. 117, 120, 558 P.2d 1102 (1976).

The trial judge obviously wanted to protect against any confusion or misunderstanding in the minds of the jury which might have resulted from the appellant's unstable appearance and the

subsequent continuance. A full record was made of the court's communications to the jury during the appellant's absence and nothing improper or of any substance concerning the case was said. The appellant's presence was not essential to a fair and just determination of a substantial issue in the case and would not have aided in his insanity defense. It is apparent that no prejudice was suffered from this error.

Next the appellant alleges the court erred in refusing to admit into evidence video tapes of an interview with the appellant conducted by Dr. Moeller on January 15, 1982. Dr. Moeller conducted three interviews with the appellant, the last of which was taped and was offered as evidence. A hearing on the admissibility of the tapes was held outside the presence of the jury. Dr. Moeller testified the appellant's conduct during the interview formed part of the basis of his opinion that the appellant did not know the difference between right and wrong when the crime was committed, and the tapes would assist him in explaining his conclusions to the jury.

The trial court viewed the tapes and refused to admit them into evidence. Initially the court ruled the tapes were inadmissible hearsay under K.S.A. 60-460. Following a renewed motion to offer the tapes the court ruled they were also inadmissible because only one of the three interviews had been taped, which would place undue emphasis on that interview and distort the overall picture of the appellant's mental condition. Also, it would raise a collateral issue before the jury regarding the validity of the doctor's conclusions. The court later modified its ruling by stating the tapes probably constituted admissible hearsay under 60-460(*l*) as statements of the declarant's then-existing state of mind, but would not be admitted on the basis that it raised a collateral issue.

The appellant offered the tapes to lend support to Dr. Moeller's diagnosis of the appellant's mental condition and opinion that the appellant was legally insane at the time the crime was committed. Dr. Moeller indicated the tapes would be useful in demonstrating to the jury the appellant's behavior during the interview, which he considered to be a significant factor in his diagnosis and conclusions. The tapes were not offered to prove the truth of the statements made by the appellant during the interview, but rather to show state of mind and

behavior at that time in support of Dr. Moeller's conclusions, and therefore did not constitute hearsay evidence. However, the videotapes of the interview were properly excluded for the following reasons.

The admission of expert testimony is controlled by K.S.A. 60-456(b), which reads:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

The basis for the admission of expert testimony is the need to assist the jury under the facts of the particular case. *State v. Reed,* 226 Kan. 519, 521, 601 P.2d 1125 (1979). In *Massoni v. State Highway Commission,* 214 Kan. 844, Syl. ¶ 3, 522 P.2d 973 (1974), we held:

"Opinion testimony is not without limitations and although an expert witness may be permitted to give an opinion bearing on the ultimate issue he may do so only insofar as the opinion will aid the jury in the interpretation of technical facts or when it will assist the jury in understanding the material in evidence."

See also *State v. Moore,* 230 Kan. 495, 497, 639 P.2d 458 (1982).

The general rule concerning limitations on the admissibility of expert testimony is stated in 31 Am. Jur. 2d, Expert and Opinion Evidence §§ 20, 21:

"Expert testimony is admissible only where, by reason of peculiar skill and experience, inferences which an ordinary untrained mind cannot deduce can be drawn from facts, or where such testimony relates to a subject which is not within the average experience and common understanding of the jury. Since expert testimony constitutes an exception to the general rules of evidence—an exception founded upon necessity—the admission of such testimony should be limited within the bounds of necessity.

. . . .

"Expert opinion testimony, while not limited or restricted in its scope to matters of science, art, or skill, cannot invade the field of common knowledge . . . . If the subject is one of common knowledge, as to which the facts can be intelligibly described to the jury and understood by them and they can form a reasonable opinion for themselves, the opinion of an expert will be rejected."

See also *Gardner v. Pereboom,* 197 Kan. 188, 195, 416 P.2d 67 (1966); 2 Jones on Evidence § 14:28 (6th ed. 1972).

It has been recognized that the issue of a person's mental capacity is one where expert opinion is particularly useful and

oftentimes necessary. As stated in 2 Jones on Evidence § 14:38 (6th ed. 1972):

"But there is no subject quite so remote from the capacity of a jury to pass on the issue without the aid of expert testimony as that pertaining to sanity or insanity. The manifestations of mental derangement and the significance of symptoms are of such importance as to call for expert appraisal in most cases . . . ."

The necessity of expert testimony in this area is also discussed in 31 Am. Jur. 2d, Expert and Opinion Evidence § 86:

"Probably in no class of cases is the use of expert testimony so general and almost indispensable as in that where the issue is sanity or insanity. Unless a person is a raving maniac or complete imbecile, it is evident that a jury can hardly be deemed competent to reach a satisfactory decision on the question of his mental condition without being instructed by expert witnesses as to the manifestations of mental derangement or disease and the significance of symptoms which are in evidence. . . .

. . . .

"A qualified expert may, in a criminal case, state his opinion as to the sanity of the accused at the date of the event in question, although his opinion is based solely on an examination subsequently made."

It is also a well-established principle that an expert witness can be examined concerning the facts upon which his opinion is based. *State v. Pyle,* 216 Kan. 423, 442, 532 P.2d 1309 (1975); *State v. Dargatz,* 228 Kan. 322, 331, 614 P.2d 430 (1980); *Chandler v. Neosho Memorial Hospital,* 223 Kan. 1, 6, 574 P.2d 136 (1977); *State v. Brooks,* 217 Kan. 485, 536 P.2d 1365 (1975); K.S.A. 60-458; 31 Am. Jur. 2d, Expert and Opinion Evidence §§ 36, 86; 2 Jones on Evidence § 14:19 (6th ed. 1972). As was stated in *State v. Pyle,* 216 Kan. at 442, the underlying data upon which a psychiatric expert opinion is based would, presumably, be in large part the communications made by the subject to the doctor. It does not necessarily follow, however, that this rule entitled the appellant to introduce the videotape of the interview into evidence to permit the jury to see for themselves the behavior of the appellant on which Dr. Moeller partially based his opinion.

The interviews involved here were conducted by Dr. Moeller long after the event to enable him to form an expert opinion concerning the appellant's mental condition *at the time the crimes were committed.* The appellant argues the jury should have been permitted to see for themselves the mental deterioration exhibited during the third interview, rather than hear "mere

opinions" about the behavior. The issue before the jury is whether or not the appellant was legally insane at the time the crimes were committed, not whether at a later point in time the appellant exhibited mental aberrations. The behavior of an accused subsequent to the event in question is relevant at trial to the issue of insanity only where it can assist in determining the accused's mental condition *at the time of the event*. As noted by the authorities cited above, members of a jury usually are not competent to analyze the defendant's behavior and render a decision on the issue of his mental condition at a specific point in time without the testimony of expert witnesses concerning the manifestations of mental derangement and the significance of the defendant's symptoms.

Other courts have considered the admissibility of videotape and sound recordings under similar circumstances. In *State v. White,* 60 Wash. 2d 551, 568, 374 P.2d 942 (1962), *cert. denied* 375 U.S. 883 (1963), the court approved the exclusion of a tape recording of an interview between the defendant and his psychiatrist conducted while the defendant was under the influence of a truth serum. The defendant contended the tape recording was not offered to prove the truth of statements made by him during the interview, but to enable the jury to better understand the basis of the psychiatrist's opinion concerning his mental condition. The court stated:

"A layman would find it extremely difficult, if not impossible, to make an accurate evaluation of the testimony which was offered. On the other hand, the possibility that a jury might be confused or misled by such evidence is quite real. Therefore, the trial court could have concluded that whatever dubious value such testimony might have would be more than outweighed by the danger of its misinterpretation and misuse by the jury."

Similarly, in *Tripp v. State,* 36 Md. App. 459, 482-83, 374 A.2d 384 (1977), it was held the trial court did not abuse its discretion in excluding a videotape of an interview with the defendant conducted while a truth serum was being administered. The interview was a basis for the testimony of the psychiatric experts on the issue of insanity. In ruling on its admissibility the trial court noted the strong possibility "that the jury would be misled into considering certain answers, given under the influence of the drug, upon the merits of the case and not as the basis for an expert psychiatric opinion." See also *State v. Harris,* 241 Or. 224, 405 P.2d 492 (1965); *Eaton v. State,* 394 A.2d 217 (Del.

1978). *Cf. Pratt v. State,* 39 Md. App. 442, 452-54, 387 A.2d 779 (1978), *aff'd* 284 Md. 516, 398 A.2d 421 (1979).

Here the videotapes were offered by the appellant to support Dr. Moeller's opinion concerning the appellant's mental condition at the time the crimes were committed. It is highly possible that the jury would be misled by the evidence and misuse it in considering the issue of insanity on the night in question, rather than limiting its use to support the basis of Dr. Moeller's opinion. Furthermore, as noted above, the jury does not possess the training, skill or experience to analyze the behavior of the appellant exhibited during the interview and interpret from it his mental condition at the time the crimes were committed. The strong possibility of misuse of the evidence by the jury outweighs whatever probative value the evidence may have had in lending support to Dr. Moeller's conclusions. In addition, the admission of this evidence would have placed before the jury the issue of the validity of the expert's conclusions and would have required them to evaluate whether, based upon that evidence, those conclusions were proper. This the jury was not qualified to do.

Dr. Moeller's conclusions and the basis thereof were thoroughly developed and tested through direct and cross-examination. He testified he used the three interviews with the appellant, as well as several psychological tests and medical records, in evaluating the appellant's condition. Dr. Moeller was questioned on both direct and cross-examination concerning statements made by the appellant and his behavior during the interviews. We conclude the videotapes of the interview between the appellant and his expert witness were properly excluded.

The appellant further argues the trial court erred in refusing to admit the tapes once the prosecution "opened the door" to their introduction during cross-examination of Dr. Moeller. The appellant relies on the oft-stated rule that where a defendant opens an otherwise inadmissible area of evidence, the prosecution may then present evidence on that formerly forbidden subject. *State v. Moses,* 227 Kan. 400, 404, 607 P.2d 477 (1980); *State v. Roach,* 223 Kan. 732, 737, 576 P.2d 1082 (1978); *State v. Wasinger,* 220 Kan. 599, 604, 556 P.2d 189 (1976). During cross-examination of Dr. Moeller the prosecutor made inquiries regarding the appel-

lant's conduct and statements during the three interviews. Following cross-examination, defense counsel reoffered the tapes, arguing the prosecutor's questioning had opened the door to their introduction.

This point is without merit for two reasons. First, the subject of the interviews was first opened by defense counsel on direct examination of Dr. Moeller by questioning him concerning what took place during the interviews, including statements made by the appellant as well as his behavior. On cross-examination the prosecution was entitled to explore the details of the interviews further. Not only was cross-examination entirely within the scope of direct, but no objection was raised to this line of questioning. Secondly, as noted earlier, in the area of expert testimony the adverse party may question the witness on cross-examination concerning the data upon which his opinion was based. Dr. Moeller stated during direct examination that his conclusion concerning the appellant's sanity was based in part on the interviews with the appellant. For these reasons the State properly cross-examined Dr. Moeller on the subject of the interviews. The appellant was not entitled to offer the tapes of the third interview into evidence where he himself had opened the area of the interviews on direct examination.

The next point involves a "personal history sheet" prepared by police from information elicited from the appellant. Following his arrest the appellant was advised of his *Miranda* rights. He stated he wanted to speak to an attorney and questioning ceased. A few hours later a detective with the Wichita Police Department, Ted Milham, introduced himself to the appellant and told him he wanted to talk to him about a shooting, but first, it was necessary to fill out a personal history sheet on the appellant. The information obtained from the appellant included his name, address, physical description, description of his car, names and addresses of relatives, prior arrests, and his parole officer. The detective estimated it took five minutes to complete the form. He testified the appellant's speech was clear and understandable, and he did not have any hesitation about his answers. He further testified it was his opinion that at the time the appellant knew the difference between right and wrong and the nature and quality of his acts. The appellant contends this information was elicited from him during a custodial interrogation after asserting

his right to counsel, in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966).

In *Miranda* the United States Supreme Court directed that an accused be apprised of his constitutional rights against self-incrimination and to the assistance of counsel before a custodial interrogation is conducted. The court stated:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. . . .

. . . .

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S. 473-75.

In *Rhode Island v. Innis*, 446 U.S. 291, 64 L.Ed.2d 297, 100 S.Ct. 1682 (1980), the Supreme Court defined "interrogation," as it is used in the context of *Miranda,* to refer to whenever a person in custody is subjected to either express questioning or its functional equivalent in the form of "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301. The court also stated that "'[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." 446 U.S. at 300.

In the present case the parties agreed the appellant was fully informed of his *Miranda* rights and had invoked his right to counsel at the time the detective sought the information from him for the personal history sheet. The question squarely presented is whether the taking of personal background information from an accused after he has asserted his right to counsel amounts to an interrogation in violation of the right to remain silent under *Miranda* until an accused has had an opportunity to consult with a lawyer.

The appellant relies on *United States v. Hinckley*, 672 F.2d 115 (D.C. Cir. 1982), in which the defendant, John Hinckley, Jr., was arrested for the attempted assassination of President Ronald Reagan. While in the custody of the local police department

Hinckley was advised of his rights and requested to speak to an attorney. He was later turned over to the Federal Bureau of Investigation and F.B.I. agents were informed that he did not want to make a statement until consulting with an attorney. Later an agent asked Hinckley to answer several background questions. For 25 minutes, in response to the agent's questions, Hinckley provided information about his physical description, criminal record, parents' names and addresses and father's employment, the name of his defense lawyer, his marital status, his closest friend, military service, a description of his car, his educational background and employment history. In addition he was asked about his activities over the preceding year and erratic travel patterns, including names, dates and addresses of hotels he had stayed at during this time, his medical problems, psychiatric treatment and relationship with his parents. Hinckley then renewed his request for an attorney and the interview stopped.

The court held the questioning by the F.B.I. was an interrogation within the meaning of *Miranda* and *Innis* and thus violated Hinckley's right to remain silent after his request for an attorney. The court reasoned that the agents would have been aware that Hinckley would present an insanity defense and the defendant's responses to the background questions would later prove to be relevant to the determination of the defendant's sanity. Of more significance was the likelihood that the agents' observations about Hinckley's demeanor during the interview would be a key part of the government's rebuttal to the insanity defense. The court concluded that under the circumstances the 25-minute "background" interview was designed to elicit incriminating responses as defined in *Innis*. The court rejected the government's argument that the questioning fell outside of *Miranda* because it was mere "standard processing procedures" and was "essentially administrative." The questioning was not similar to normal police booking procedures and was undertaken to determine, *inter alia*, whether others were involved in the attempted assassination, and the degree of danger Hinckley posed to those protected by the Secret Service. 672 F.2d at 122-23.

In contrast to *Hinckley*, the majority of federal circuit courts of appeals have held the routine gathering of background biographical data will not constitute an interrogation. In *United*

*States ex rel. Hines v. LaVallee,* 521 F.2d 1109, 1113 (2d Cir. 1975), *cert. denied* 423 U.S. 1090 (1976), the court distinguished between questioning designed to investigate crimes, or the involvement of the arrested person in crimes, and noninvestigative questioning, holding that obtaining basic identification data required for booking did not constitute a *Miranda* violation. Similarly, in *United States v. Grant,* 549 F.2d 942, 946-47 (4th Cir.), *cert. denied* 432 U.S. 908 (1977), it was held the *Miranda* rule only prohibits investigative interrogation related to the specific crime itself and does not prevent a police officer from seeking standard identification information from the suspect where the officer acts in good faith and without guile or subterfuge in conducting his inquiry. See also *Harryman v. Estelle,* 616 F.2d 870, 874-75 (5th Cir.), *cert. denied* 449 U.S. 860 (1980), (apparently citing *LaVallee* with approval); *United States v. Menichino,* 497 F.2d 935, 941 (5th Cir. 1974); *United States v. McDaniel,* 463 F.2d 129, 136 (5th Cir. 1972), *cert. denied* 413 U.S. 919 (1973); *United States v. Regilio,* 669 F.2d 1169, 1177 (7th Cir. 1981), *cert. denied* 457 U.S. 1133 (1982); *United States v. Prewitt,* 553 F.2d 1082, 1085-86 (7th Cir.), *cert. denied* 434 U.S. 840 (1977); *United States v. Booth,* 669 F.2d 1231, 1238 (9th Cir. 1981); *United States v. LaMonica,* 472 F.2d 580, 581 (9th Cir. 1972); *United States v. Glen-Archila,* 677 F.2d 809, 815-16 (11th Cir. 1982). Holding otherwise is *Proctor v. United States,* 404 F.2d 819 (D.C. Cir. 1968), where it was held a routine booking question concerning the defendant's employment which was later used at trial to impeach him constituted a per se violation of *Miranda.* However, that court has since indicated its holding in *Proctor* may need to be modified in light of the subsequent decision by the Supreme Court in *Innis.* See *United States v. Foskey,* 636 F.2d 517, 522 n. 3 (D.C. Cir. 1980). Several state courts have also agreed that normal identifying and biographical information inquiries by police do not constitute interrogation. *Varner v. State,* 418 So. 2d 961, 962 (Ala. Crim. App. 1982); *State v. Cozad,* 113 Ariz. 437, 439, 556 P.2d 312 (1976); *State v. Rassmussen,* 92 Idaho 731, 735-36, 449 P.2d 837 (1969); *People v. Stewart,* 84 Ill. App. 3d 855, 858-59, 406 N.E.2d 53 (1980); *State v. Beatty,* 305 N.W.2d 496, 498-99 (Iowa 1981); *Clarke v. State,* 3 Md. App. 447, 450-51, 240 A.2d 291 (1968); *State v. Widell,* 258 N.W.2d 795, 797 (Minn. 1977); *Upshaw v.*

*State*, 350 So. 2d 1358, 1364-65 (Miss. 1977); *State v. Jordan*, 506 S.W.2d 74, 82-83 (Mo. App. 1974); *State v. Cunningham*, 153 N.J. Super. 350, 352, 379 A.2d 860 (1977); *People v. Rivera*, 26 N.Y.2d 304, 309, 310 N.Y.S.2d 287, 258 N.E.2d 699 (1970).

This question has not been previously addressed by our court. We recently held in *State v. Taylor*, 231 Kan. 171, 174, 642 P.2d 989 (1982), that a request for a person in custody to identify himself is not an interrogation within the meaning of *Miranda* and *Innis*. In *State v. Newfield*, 229 Kan. 347, 623 P.2d 1349 (1981), we discussed the relevant Supreme Court cases and held that where incriminating statements made by an accused are introduced by the State, the State must prove:

"(1) [T]hat the accused knowingly and intelligently waived his right to retained or appointed counsel; (2) that interrogation ceased for an appreciable period when the accused requested consultation with an attorney; and (3) that the statements made by the police after the request for counsel did not amount to questioning, its functional equivalent, or statements known to be likely to produce an incriminating response." 229 Kan. at 355.

In *Newfield* the defendant asked to talk to a lawyer before further questioning from K.B.I. agents and discussed with the agents what lawyer he could call. One of the agents then told the defendant that if he wanted to talk to them he would have to do it at that time because his attorney would tell him not to talk to the K.B.I. Shortly thereafter the defendant gave an incriminating statement to the agents. We held the defendant voluntarily waived his right to counsel. The statement made by the agent was not likely to elicit an incriminating statement if the defendant did not want to make one and was not the "functional equivalent" of direct questioning after assertion of his right to counsel, in violation of *Miranda* and *Innis*.

The questions asked the appellant apparently were routine police booking questions and did not relate in any way to the crime charged or the defendant's involvement in the crime. None of the questions can reasonably be construed as being likely to elicit an incriminating response from the accused. The appellant contends, however, they were incriminating because the description of the appellant's vehicle matched the description of the car seen leaving the victim's house and because Detective Milham was allowed to testify concerning the appellant's demeanor during the questioning. The fact the description of the appellant's car was obtained can hardly be considered

incriminating in view of the fact it was largely undisputed the appellant committed the crime and therefore it was of little significance that his car was seen leaving the scene. Furthermore, there is no indication the detective was aware of or would have known at the time that the appellant would raise an insanity defense. Detective Milham did not ask the questions in order to view the appellant's demeanor and capacity to answer; rather, it would appear the information was needed for administrative purposes.

The *Hinckley* case is distinguishable from the present case. The *Hinckley* court stressed that F.B.I. agents were obviously conducting an investigative interrogation under facts known to them at the time of the interview. The interview lasted 25 minutes and the information sought went far beyond the scope of normal booking inquiries. Testimony of the interviewing agents clearly demonstrated that the goal of the questioning was to obtain information concerning the crime charged and Hinckley's involvement in the crime. The court contrasted this inquiry to the "routine processing questions" asked of Hinckley by the local police department after he had requested counsel, which apparently was considered by the court to be a permissible practice. 672 F.2d at 123. This information included the defendant's name, aliases, address, sex, race, and date and place of birth. 672 F.2d at 120 n. 30.

In this case the information taken by Detective Milham cannot be compared to the lengthy inquiry conducted by the F.B.I. agents in *Hinckley*. Instead it more closely parallels the information obtained by the local police department in the *Hinckley* case. The interview conducted by Detective Milham covered a shorter length of time—five minutes—and none of the questions asked were designed to, nor in actuality did, elicit any information concerning the crime charged or the appellant's involvement in the crime.

The information obtained from the appellant to complete the personal history sheet following his request for counsel did not violate his rights against self-incrimination and right to counsel under *Miranda*. The personal background questions did not constitute an "interrogation" within the meaning of *Miranda* and *Innis*. The trial court did not err in admitting the personal history sheet and Detective Milham's testimony into evidence.

The appellant next contends the trial court erred in allowing the State's expert witness to testify about the weight and credibility to be given to previous testimony of certain witnesses. The State called as a rebuttal witness Dr. Robert Schulman, a clinical psychologist. Dr. Shulman testified he did not consider the psychological tests performed by Dr. Moeller to be valid or reliable. Toward the end of his testimony Dr. Schulman was asked by the prosecutor whether the psychological tests and hospital reports relied on by Dr. Moeller or the testimony of Karen Neil was the most reliable source of determining whether or not the appellant knew the difference between right and wrong and the nature and quality of his acts on the night of the murders. Defense counsel objected on the ground Dr. Schulman had not heard any of the previous testimony and therefore could not speculate concerning which was the better evidence in the case, and to the form of the question. The witness was allowed to answer and stated that the testimony of the person who saw what happened that night would be the most reliable source of determining the appellant's state of mind at the time.

The specific objection to Dr. Schulman's testimony raised here by the appellant was not raised at trial. The trial court was never given an opportunity to rule on this ground. This court has adhered to the rule that it will not review alleged errors in the admission of evidence in the absence of timely objection made thereto, or, if objection is made, unless the specific grounds thereof are clearly stated. *Humphries v. State Highway Commission,* 201 Kan. 544, 551, 442 P.2d 475 (1968); *State v. Parker,* 213 Kan. 229, 232, 516 P.2d 153 (1973); K.S.A. 60-404. The specific ground of the objection to the admissibility of this evidence was not properly raised below and therefore the claim of error will not be considered on review.

As his final point on appeal the appellant contends the trial court erred in refusing to instruct the jury on the lesser included crime of second-degree murder. This court has stated on numerous occasions that the district court's duty under K.S.A. 21-3107(3) to instruct on lesser included offenses arises only when there is evidence under which the defendant might reasonably have been convicted of the lesser offense. *State v. Hutton,* 232 Kan. 545, Syl. ¶ 5, 657 P.2d 567 (1983); *State v. Prince,* 227 Kan. at 140. We have also pointed out that before

instructions on lesser included offenses are required there must be positive testimony presented by the defendant for the express purpose of proving a version of how the homicide occurred which is contrary to the version presented by the State. *State v. Hutton,* 232 Kan. at 554; *State v. Marks,* 226 Kan. 704, 714, 602 P.2d 1344 (1979).

Second-degree murder is defined as the malicious killing of a human being committed without deliberation or premeditation. K.S.A. 21-3402. The appellant contends it could be inferred from Karen Neil's testimony the killings were not premeditated. Specifically, the appellant points to evidence that he unloaded his shotgun on two occasions and allowed Aimee to hold it briefly, that he allowed Karen and Maria to leave the room, and a statement made by Karen shortly after the killings that he had seemed to change his mind back and forth as to whether to shoot the victims. The appellant also points to evidence that he had two alcoholic drinks just prior to the shootings and another earlier in the evening, from which the jury could have inferred the appellant was too intoxicated to form the intent to kill. The appellant further contends evidence was presented that the killing of Gabriel Longeria was unintentional. The State called Ronnie Keeney as a witness who testified about a conversation with the appellant in jail, during which the appellant stated he had not meant to shoot Gabriel, but that "the girl put the little boy in front of herself to protect herself, and that's how he shot the little boy."

In order to negate the State's theory of the case, evidence must have been presented which would have supported the conclusion the appellant did not commit the killings with premeditation and deliberation. The overwhelming evidence presented by the State showed the victims were brutally killed by shotgun blasts at close range to the head and chest areas, the appellant came to the house armed with a loaded shotgun which he unloaded and reloaded twice while virtually holding the residents of the house hostage prior to the killings, and that he told the victims he would have to kill them all so no witnesses would be left. The appellant's defense was that if he committed the killings he was legally insane at the time. The testimony of the witnesses called by the appellant centered upon the issue of the appellant's mental condition before and after the killings. No

affirmative evidence was presented by the appellant contradicting the State's version of how the crime was committed. The evidence upon which the appellant relies was either testified to by the State's witnesses on direct examination or was elicited on cross-examination to corroborate the appellant's insanity plea. Further, evidence that the appellant had consumed alcoholic beverages was insufficient standing alone to negate the element of intent and require an instruction on lesser offenses. No evidence was introduced that the appellant was even intoxicated, much less that he was intoxicated to such an extreme as to prevent the existence of an intent to kill. See *State v. Seelke*, 221 Kan. 672, 678, 561 P.2d 869 (1977); *State v. Masqua*, 210 Kan. 419, 425, 502 P.2d 728 (1972), *cert. denied* 411 U.S. 951 (1973).

While it is true the defendant is entitled to have his theory of the case presented to the jury under appropriate instructions, intoxication was never presented by the appellant as a theory in this case, and he cannot do so for the first time on appeal. The appellant's sole defense was insanity. The test for the giving of a lesser included instruction is not whether any theory arises under which a person could be found guilty or innocent, but whether there is sufficient evidence to support the giving of an instruction of the lesser charge. *State v. Prince*, 227 Kan. at 140. Here the evidence would not have supported a conviction of second-degree murder. To have given the instruction on that offense "would have permitted the jury to speculate on a degree of homicide not in the case upon any theory." *State v. Zimmer*, 198 Kan. 479, 504, 426 P.2d 267, *cert. denied* 389 U.S. 933 (1967).

The judgment of the lower court is affirmed.