(784 P.2d 366)
No. 62,767

STATE OF KANSAS, *Appellee,* v. JONATHAN YOUNG, *Appellant.*

Opinion filed July 14, 1989.

*Benjamin C. Wood,* special appellate defender, and *Jessica R. Kunen,* chief appellate defender, for the appellant.

*Libbie A. Moore,* assistant county attorney, *Gene Porter,* county attorney, and *Robert T. Stephan,* attorney general, for the appellee.

Before DAVIS, P.J., BRISCOE, J., and JACK L. BURR, District Judge, assigned.

DAVIS, J.: Defendant Jonathan Young appeals his convictions for aggravated battery (K.S.A. 21-3414), abuse of a child (K.S.A. 21-3609), and obstructing legal duty (K.S.A. 21-3808) on the grounds that (1) the court erred by failing to instruct on the lesser included offense of battery; (2) the offense of child abuse merges into the offense of aggravated battery; (3) evidence of defendant's prior wrongful acts was erroneously admitted; (4) the court erred in not giving an accomplice witness instruction; and (5) his sentence for obstructing legal duty is illegal. We agree that defendant's sentence for obstructing legal duty should be modified to a minimum of one year rather than two years. Otherwise, we find no reversible error and affirm.

Twelve-year-old Tyson Newman was badly beaten during the late afternoon and early evening of September 18, 1987. Defendant Jonathan Young, who had been living with Tyson's mother, Mary Caldwell, for the past four years, was arrested and charged with the crime. At trial, two different versions of events emerged.

The State's evidence was as follows: When Tyson arrived home from school on Friday, September 18, 1987, defendant asked him if he was ashamed to be part black and part white. (Tyson is of mixed race; defendant is black, and Mary Caldwell is white.) When Tyson answered that he was not, defendant asked him if he knew what the word "conflict" meant. Tyson did not. He looked "conflict" up in the dictionary, but did not understand the definition.

At about this time, Tyson's mother, Mary Caldwell, came home from beauty school. Defendant told her that Tyson was ashamed of himself and that Tyson was going to get a whipping. Defendant picked up a belt and began whipping Tyson with it, mostly below the waist and above the knees. When the belt broke, defendant had Mary Caldwell get him another.

After a while, Mary Caldwell suggested to defendant that they should go to the grocery store. Defendant, Mary Caldwell, and Tyson's younger brother James went to the store and were gone about 10 to 15 minutes. Tyson did not leave while they were gone because he was hurt and could hardly move.

When they got back, defendant started whipping Tyson again. Defendant also picked Tyson up and threw him down and sat on his back so that he could hardly breathe. At some point or points during the beating, defendant got tired and ordered Mary Caldwell to continue hitting Tyson. Mary Caldwell did so because she was afraid of defendant, but she hit Tyson only lightly.

Two neighbors heard fighting and screaming from defendant's trailer home. Through a small gap in the curtains on the window, one neighbor thought she saw defendant hitting someone quite a bit smaller than himself, although she did not actually see him strike anyone. The neighbors also saw the trailer rocking back and forth as if people were fighting or running around inside. One of the neighbors went up to the manager's trailer and told

the manager to call the police. After some delays, the manager did call the police.

Corporal Terry Ticel of the Great Bend Police Department was dispatched to the disturbance at 6:19 p.m. Officer Ray Reno, who was in a separate car, was also dispatched. They arrived at about the same time and knocked on the door. After 30 to 45 seconds, Mary Caldwell opened the door and told them that her husband was disciplining one of her boys. She invited them in. Ticel went to the back bedroom and saw defendant on the bed with Tyson lying on him. Tyson was crying.

Ticel asked defendant to come out and talk with him. Defendant answered in a very harsh voice that he was talking with his son and would come out when he was finished. After 3 to 4 minutes, Ticel repeated his request and defendant became very angry and told Ticel to leave. Defendant eventually did come out, but refused to give his name or any other information to the officers. He was very angry, had a strong odor of alcohol, and appeared to be under the influence. Officer Reno explained that the police had been called to investigate a disturbance and asked defendant if there had been a problem in the house. Defendant stated that there had not been a problem and that he was just disciplining his son.

Tyson came out. He was hunched over, walking very slowly, making low moans and groans, and crying. As Tyson came into the room, Ticel heard defendant say something to Tyson about not telling the police anything. Officer Reno asked Tyson why he was moaning, and Tyson answered that his legs hurt. Reno then asked to see Tyson's legs and Tyson agreed to let Reno look at them if he could put a robe on. Defendant then leaned over to where Tyson was standing, and Reno heard him tell Tyson in a low voice, "[I]f you say anything, I'll go to jail." Tyson then went into a back room with Mary Caldwell, took off his long-legged pants, and put on a robe. Reno observed that the back of Tyson's legs had been severely beaten, that Tyson had large, blood-filled welts on his legs, that Tyson's backside from his buttocks to his knees were black and blue and had red welt marks, and that Tyson had a cut on his head and a scratch-type injury over his right eye. Reno asked Tyson how he had received those injuries and Tyson answered that defendant had beaten him

with a belt. Reno told Ticel what he had seen and asked Ticel to look at Tyson. The two officers then conferred and decided to arrest defendant.

Defendant refused to cooperate with the arresting officers. Because of this, he was charged with and convicted of obstructing legal duty. Because he is challenging only the sentence for this conviction and not the conviction itself, the facts supporting this conviction are omitted.

Officer Reno took Tyson, James, and Mary Caldwell to the hospital, where Detective Dan Bayes took color photographs of Tyson's injuries. At the hospital, Mary Caldwell told Detective Bayes that she had hit Tyson too. After being *Mirandized*, she stated that, when defendant got tired of hitting Tyson, he told her to spank Tyson, and she did for about five minutes, but tried not to hurt him. She stated that, if she had not done what defendant told her to do, he would have beaten her, too.

Defendant's testimony differed markedly from the testimony of the State's witnesses. He testified that, about one and one-half months before the incident, a neighborhood kid had called James or Tyson a "nigger." He asked them how they felt and if they were ashamed of themselves. James said "no," but Tyson said he was ashamed of being half white/half black. Defendant told Mary Caldwell about this when she got home. She got upset and spanked Tyson hard with a belt. Mary Caldwell later told defendant that she had spanked Tyson because she thought Tyson was ashamed that she "had been with a black man before."

A few days before the incident, defendant learned that Tyson had gotten into a fight with some white boys, and defendant assumed that the fight had to do with race. On the day of the incident, after he had admittedly been drinking, he asked Tyson if he had a "conflict" with himself. Defendant explained to Tyson that he was "going to get a whipping" because defendant "figured that he was still ashamed of himself, and I was going to tell his mother when she got home."

When Mary Caldwell got home, defendant told her that he thought Tyson was still ashamed of himself. Mary Caldwell got mad, began yelling, and began to spank Tyson with a belt. After a while, Tyson ran out yelling. Defendant grabbed him, put him on the couch, and spanked him with his hand three or four times

"to show support" for Mary Caldwell's discipline. Mary then resumed beating Tyson until they went to the store.

After they got back from the store, Mary started beating Tyson again and defendant laid down and slept on the couch. Then the police arrived and defendant went into the back room because he wanted to avoid contact with the police after having been drinking. When he got to the back room, he found Tyson on the bed and he tried to speak with him. He admitted being angry with the officers but said it was because he did not think they should interfere with mother-son discipline and because he did not know how badly Tyson had been beaten.

The jury convicted defendant of aggravated battery, child abuse, and obstructing legal duty. The court sentenced defendant to concurrent terms of 5-20 years for aggravated battery, 3-10 years for child abuse, and 2-5 years for obstructing legal duty.

## INSTRUCTION ON BATTERY

The defendant requested an instruction on the lesser included offense of battery. The court responded that "you only need to give the lesser included offense if the fact warrants the lesser included." And, on the facts of the case, the court stated, "It's either got to be an aggravated or it's nothing at all." Defendant then argued that Mary Caldwell had been implicated in the beating and that the jury could find that she had done most of it and that defendant had merely committed a simple battery. The court responded it could not accept that argument and that, if the jury felt that defendant had not done most of the beating, the jury could find him not guilty. On appeal, defendant again argues that "the evidence might have reasonably caused a jury to convict of the lesser included offense" and therefore "the court had a duty to instruct" on simple battery.

The trial court's duty to instruct on lesser included offenses is stated in K.S.A. 21-3107(3):

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced."

This statute has been the subject of numerous appellate decisions. In the most recent decision, the Supreme Court stated:

"It is a familiar rule, as codified in the statute, that a trial court has an affirmative duty to instruct the jury on lesser included offenses, including lesser degrees of the same crime; however, this duty does not arise unless there is evidence supporting the lesser offense. Further, we have held that in order for the evidence to be sufficient to require instructions on lesser included offenses, testimony supporting such instructions must be offered either by the State or the defense for the purpose of proving what events occurred." *State v. Patterson*, 243 Kan. 262, 267, 755 P.2d 551 (1988).

Finally, the evidence supporting the lesser offense must be such that the jury might reasonably convict the defendant of the lesser offense. If there is no such evidence, "the instruction need not be given." *State v. Hill*, 242 Kan. 68, 73-74, 744 P.2d 1228 (1987).

The question, then, in this case is whether either the State or the defense offered any evidence regarding how Tyson was injured, based on which evidence the jury might reasonably have convicted defendant of battery. We conclude that there was no such evidence.

Battery "is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner." K.S.A. 21-3412. Aggravated battery "is the unlawful touching or application of force to the person of another with intent to injure that person" and which "[i]nflicts great bodily harm upon him." K.S.A. 21-3414. Aggravated battery differs from battery in that it requires proof of "intent to injure" and of "great bodily harm."

Defendant testified that he spanked Tyson with his hand "on his bottom" about "three or four times" to "show support" for Mary Caldwell's disciplining of her son. He denied that he did "a whole lot more" than that. He also testified that he did not have any reason for spanking Tyson other than "to show support" for Mary.

For a battery to be committed, the touching must be "done in a rude, insolent or angry manner." Defendant did not admit to spanking Tyson in a "rude, angry or insolent manner"; rather, he was merely disciplining a child whom he regarded as his son. His testimony, if believed, showed that he was not guilty of either aggravated battery or simple battery. An instruction on battery was therefore not required. See *State v. Hill*, 242 Kan. at 73-74 (an instruction on a lesser included offense is "unnecessary where

the defendant's testimony precludes a conviction for the lesser offense").

Defendant also argues that an instruction on battery was required because the jury could have found that his intoxication negated the "intent to injure" element of aggravated battery. This contention is disposed of by *State v. Garcia*, 233 Kan. 589, 664 P.2d 1343 (1983). Garcia was charged with three counts of first-degree murder and one count of aggravated battery. He pled not guilty by reason of insanity and was convicted on all four counts. On appeal, he argued that the jury should have been instructed on the lesser included crime of second-degree murder since the jury could have inferred from testimony that he had been drinking earlier in the evening and that he was too intoxicated to form a premeditated intent to kill. The Supreme Court rejected this argument, stating:

"While it is true the defendant was entitled to have his theory of the case presented to the jury under appropriate instructions, intoxication was never presented by the appellant as a theory in this case, and he cannot do so for the first time on appeal. The appellant's sole defense was insanity. The test for the giving of a lesser included instruction is not whether any theory arises under which a person could be found guilty or innocent, but whether there is sufficient evidence to support the giving of an instruction of the lesser charge. [Citation omitted.] Here the evidence would not have supported a conviction of second-degree murder. To have given the instruction on that offense 'would have permitted the jury to speculate on a degree of homicide not in the case upon any theory.' *State v. Zimmer*, 198 Kan. 479, 504, 426 P.2d 267, *cert. denied* 389 U.S. 933 (1967)." 233 Kan. at 610.

In this case, defendant's defense was that he did not commit the crime, someone else did. Defendant did not defend himself on the theory that he committed the acts in question, but was not guilty because he was too drunk to form the necessary intent to injure. As the trial judge concluded, the defendant was, depending on whose testimony the jury believed, either guilty of aggravated battery or guilty of no battery at all. The trial court did not err in refusing to give an instruction on battery.

## MERGER

At trial, defendant argued that the crimes of battery and child abuse merged and that the State should therefore be permitted to prosecute either one or the other, but not both. The trial

court responded that it had initially leaned toward defendant's argument, but, after researching the case law, had concluded that the offense did not merge since child abuse required proof that the victim was under the age of 18.

K.S.A. 21-3107 governs multiple prosecutions for the same act. It provides:

"(1) When the same conduct of a defendant may establish the commission of more than one crime under the laws of this state, the defendant may be prosecuted for each of such crimes. Each of such crimes may be alleged as a separate count in a single complaint, information or indictment.

"(2) Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

. . . .

"(d) a crime necessarily proved if the crime charged were proved."

In *State v. Arnold*, 223 Kan. 715, 716, 576 P.2d 651 (1978), Chief Justice Schroeder wrote:

"Under this section it is impossible to commit the greater offense without first having committed the lesser offense. The offense must not require some additional element which is not needed to constitute the greater offense. In other words, there must be 'identity of elements.' [Citation omitted.]

"Our court has consistently construed subparagraph (d) to mean a lesser included offense must not require proof of *any* element not necessary in the greater crime charged."

Confusion arose, however, in subsequent opinions as the appellate courts of this state applied the "identity of the elements" test to the elements of the offenses in general rather than to the elements of the offenses as applicable to the specific case at bar. See *State v. Fike*, 243 Kan. 365, 369, 757 P.2d 724 (1988).

In *State v. Adams*, 242 Kan. 20, 23-24, 744 P.2d 833 (1987), the Supreme Court attempted to clear up this confusion. Justice Allegrucci wrote:

"What we held in *Arnold*, and here reaffirm, is that the test to determine 'identity of elements' under subparagraph (2)(d) is twofold. First, the statutes defining the lesser offense and the greater offense must be compared to determine if all the elements of the former are included in the latter. Second, if that comparison fails to disclose an 'identity of elements,' then the court must examine the complaint/information to determine if the elements of the lesser offense are alleged, and if proof thereof is required to establish the greater offense. If it is, then it is a lesser included offense within the meaning of subparagraph (2)(d)."

Adams had been convicted of involuntary manslaughter and driving under the influence of alcohol. On appeal, he argued that his conviction for DUI merged into his conviction for involuntary manslaughter. The Supreme Court agreed:

"In the present case, it seems clear that, in order to prove the defendant guilty of the crime of involuntary manslaughter, the State was compelled to prove all the elements necessary to prove the crime of driving while under the influence of alcohol. Involuntary manslaughter is defined as

'the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner.' K.S.A. 1986 Supp. 21-3404(a).

The allegation that defendant Adams drove an automobile while under the influence of alcohol served as one of the elements of the charged crime of involuntary manslaughter. By proving all of the elements necessary to establish involuntary manslaughter, the State *necessarily* proved each element of the crime of driving while under the influence of alcohol, as defined by K.S.A. 1986 Supp. 8-1567. Thus, having necessarily proven the lesser offense by proving the greater offense of involuntary manslaughter, the provisions of K.S.A. 1986 Supp. 21-3107(2) prohibit finding the defendant guilty of both involuntary manslaughter and driving while under the influence of alcohol. The necessity of alleging and proving that the defendant was driving while under the influence of alcohol precluded driving while under the influence of alcohol from being a 'factually related offense.' " 242 Kan. at 24.

See also *State v. Woodman*, 12 Kan. App. 2d 110, 118-19, 735 P.2d 1102 (1987) (on the facts of the case, DUI was a lesser included offense of aggravated vehicular homicide because "all of the elements of driving while under the influence of alcohol are required to establish the greater offense of aggravated vehicular homicide"); and *State v. Fike*, 243 Kan. at 367-73 (applying two-prong *Adams* test, aggravated sexual battery is not a lesser included offense of indecent liberties with a child because aggravated sexual battery requires proof that the victim did not give actual consent and hence was not "necessarily proved" when defendant was convicted of indecent liberties with a child, which does not require proof of lack of consent). It is clear from the court's opinion in *Adams* that K.S.A. 21-3702(2)(d) does not prohibit a conviction on a lesser offense unless that offense is, on the facts of the case, necessarily proven by a conviction for a greater offense.

Turning to the facts of this case, it is clear that defendant's conviction for child abuse does not merge into his conviction for aggravated battery. Child abuse requires proof that the victim was under the age of 18 (K.S.A. 21-3609); aggravated battery does not (K.S.A. 21-3414). Therefore, by proving all of the elements of aggravated battery, the State did not necessarily prove each of the elements of child abuse.

In *In re Berkowitz*, 3 Kan. App. 2d 726, 744, 602 P.2d 99 (1979), we held that child abuse does not merge into aggravated battery because it "requires a victim under 18 years of age, an element not required for aggravated battery." Having reexamined this holding in light of *Adams*, we conclude that it remains good law.

## DEFENDANT'S PRIOR WRONGFUL ACTS

Defendant argues that the trial court committed reversible error in admitting the following: (1) Mary Caldwell's testimony that James, her other son, was "dead on account of" defendant; (2) Tyson's testimony that defendant had spanked him before and had hit his brother and mother; and (3) Officer Reno's testimony that James had told him that defendant had beaten James, Tyson, and Mary before. The State argues in reply that this testimony was admissible to establish the relationship of the family members, to establish a continuing course of conduct, to corroborate Mary Caldwell's testimony, and as evidence of "res gestae." We hold that the first statement was not improper evidence of defendant's prior wrongful acts, and, in any event, did not prejudice defendant, that the admission of the second statement was harmless error, and that the admission of the third statement cannot be challenged on appeal because it was not objected to at trial.

### Mary Caldwell's Testimony

The first statement came out during the redirect examination of Mary Caldwell. Because it is important to read the statement in context, considerable detail about the questioning of Mary Caldwell must be given.

On direct examination, Mary Caldwell testified that she was married to Donald Caldwell, that she was separated from him, and that she had never been married to the defendant.

On cross-examination, the defense questioned Mary Caldwell about her testimony at the preliminary hearing that she and

defendant were "common law" married. She answered that she and defendant had lived together for four years and that she had testified they were "common law" married because people had told her that "common law" marriage meant living together. She testified that she was not presently living with her sons, that she wanted to be reunited with her remaining son, and that getting Tyson back was the most important thing in her life and took priority over defendant. She further testified that she had had only one contact with defendant from the time he was arrested until the preliminary hearing. However, when confronted with copies, she admitted that she had written love letters to defendant while he was in jail, that these letters expressed her hope that she, defendant, and the two boys could get together again, and that she did not mention the beating incident even once in those letters.

On redirect, the State attempted to smooth over the differences the defense had brought up between Caldwell's testimony at the trial and her testimony at the preliminary hearing. Near the end of redirect, the State inquired about the letters she had written defendant and the following occurred:

"Q. [MS. MOORE FOR THE STATE]: Why were you writing him letters?

"A. [MARY CALDWELL]: Well, I guess because I still wanted him to be around. This is before I was going to counseling and stuff.

"Q. How long have you known the Defendant, ma'am?

"A. Since '83.

"Q. How do you feel about the Defendant now?

"A. I don't want to see him.

"Q. And why is that, ma'am?

"A. Because my baby's dead on account of him.

"MR. McVAY [FOR DEFENDANT]: Objection, Your Honor. This is a completely different child. That had nothing to do with this.

"THE COURT: Okay.

"MS. MOORE: Your Honor, — (interrupted)

"THE COURT: Overrule. Answer was not solicited. It was just an answer to her question. I'm going to overrule the objection.

"MS. MOORE: I have nothing further, Your Honor.

"THE COURT: Recross.

"RECROSS EXAMINATION

"BY MR. McVAY:

"Q. Which child is dead, ma'am?

"A. James.

"Q. James was not touched on this occasion, September 18th; is that correct?
"A. But it's on account he was separated — taken from me.
"Q. Ma'am, answer my question.
"On September 18th, James was not touched by this man, was he?
"A. Yes, he was.
"Q. Oh, he was?
"A. He was slapped.
"Q. Did that kill him?
"A. No. Because we was separated, that killed him.
"Q. When did he die?
"A. January.
"Q. January. Where has this man been since September 18th of 1987?
"A. In jail, I guess.
"Q. Well, you've been writing him there, haven't you? You know he's been in jail, correct?
"A. Up till the last few months.
"Q. And so you're saying that this individual killed your child; is that what you're saying?
"A. In a way, yes."

On reading the statement "my baby's dead on account of him" in context, it is apparent, contrary to the defendant's assertion, that the statement slipped out and was not solicited by the State. It is also apparent that the statement was not "incredibly damning." The defense clearly established on recross-examination that defendant could not have caused James' death and that Mary Caldwell was merely blaming him for James' death.

Defendant has not shown error in the admission of this statement. It is not improper evidence of defendant's prior crimes or civil wrongs because Mary Caldwell did not attribute any wrongful act to defendant in connection with James' death, and defendant does not argue that it should have been excluded on any other basis. But even if the statement was improperly admitted, it was clearly harmless beyond a reasonable doubt.

### Tyson's Testimony

Defendant also complains of Tyson's testimony that defendant had spanked him before and had hit his brother and mother and Officer Reno's testimony that James had told him that defendant had beaten James, Tyson, and Mary before. Again, considerable background information needs to be given.

During Tyson's testimony on direct examination, the State went

over the events of the beating in considerable detail. Near the end of direct examination, the following took place:

"Q. Tyson, had anything like this ever happened before?
"A. No.
"Q. Had you ever gotten a spanking in your life before?
"A. Yes.
"Q. Has your mom spanked you before?
"A. Yes.
"Q. Has Jonathan ever spanked you before?
"A. Yes.
"Q. Can you compare those spankings to the one you got on September 18th?
"A. The other ones, they didn't leave no bruises on and make my legs sore.
"Q. Tyson, have you ever seen Jonathan hit anyone else?
"A. Yes.
"Q. Who?
"A. My brother and my mom.
"MR. McVAY: Your Honor, can we approach?
"THE COURT: Do you have an objection:
"MR. McVAY: Yes, Your Honor. I have an objection as that I stated earlier in my motion, and I would state my objection for the record now as to what we talked about earlier this morning.
"THE COURT: Okay. The Court would renew the ruling that it's made earlier this morning regarding this.
"BY MS. MOORE: (Continuing)
"Q. Do you know how many times you've seen that happen, Tyson?
"A. A lot.
"Q. A lot.
"MS. MOORE: That's all I have, Your Honor."

Although it is not entirely clear from this exchange, it appears that the basis of defendant's objection was that Tyson's testimony was inadmissible evidence of prior wrongful acts and the court's ruling was that this evidence was admissible to show Mary Caldwell's state of mind.

On appeal, defendant argues that this testimony was inadmissible under K.S.A. 60-455, which provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

The principle behind this rule is simple: The fact that a person did something before is not proof that he did it again. See generally the comments to PIK Crim. 2d 52.06.

The State concedes that Tyson's testimony was not admissible under K.S.A. 60-455, but argues that it was admissible independent of K.S.A. 60-455 either as "res gestae" or to show the relationship of the parties, to show a course of conduct between them, and to corroborate testimony of Mary Caldwell that she was afraid of defendant because he had hit her before.

Under the concept of "res gestae," evidence of acts or declarations before, during, or after the happenings of the principal event "may be admitted as part of the res gestae where those acts or declarations are so closely connected with the principal occurrence as to form in reality a part of the occurrence." *State v. Peterson*, 236 Kan. 821, Syl. ¶ 1, 696 P.2d 387 (1985). In this case, Tyson's statements referred to no particular incidents and had no particular time frame. No connection with the beating incident of September 18, 1987, was shown. The incidents referred to were clearly too remote to be part of the res gestae of the crime.

The Supreme Court has approved the admission of evidence of prior wrongful acts to show the relationship between the parties, to show a course of conduct, and to corroborate a victim's testimony. However, as Judge Gard notes, the "exception" to K.S.A. 60-455 recognized by these cases has thus far been limited to cases involving sexual wrongs. 1 Gard's Kansas C. Civ. Proc. 2d § 60-455, pp. 141-42 (1988); see *State v. Crossman*, 229 Kan. 384, 624 P.2d 461 (1981) (in prosecution for indecent liberties with a child and aggravated sodomy, evidence about other sexual contacts between the victim and defendant is admissible where defense strategy is to show that victim is a mentally unstable child who fantasized the charged offenses); *State v. Reeves*, 234 Kan. 250, 671 P.2d 553 (1983) (in prosecution for aggravated sodomy and rape, evidence of prior incidents involving defendant and victim were admissible to explain statements made by defendant and victim during charged incident); and *State v. Moore*, 242 Kan. 1, 748 P.2d 833 (1987) (in prosecution for rape and aggravated incest, evidence of prior sexual contacts admissible to

show relationship of the parties, to establish a course of conduct, and to corroborate victim's testimony). The Supreme Court has apparently decided that the special circumstances of cases involving sexual wrongs justify an exception to K.S.A. 60-455. There is no reason, however, to extend that exception to other cases.

We think it was error to admit Tyson's testimony. This error, however, does not require reversal. K.S.A. 60-261 provides that no error in the admission of evidence is grounds for granting a new trial or otherwise disturbing a verdict "unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." The Supreme Court has interpreted this to mean that reversal is required only where the erroneous admission of evidence "is of such a nature as to affect the outcome of the trial and deny substantial justice." *State v. Walker*, 239 Kan. 635, Syl. ¶ 6, 722 P.2d 566 (1986). In this case, the error did not affect the outcome of the trial and did not deny defendant substantial justice. First, substantially the same evidence was admitted without objection when Mary Caldwell testified that defendant had hit her before and had slapped James on the day of the incident. Second, and more importantly, this portion of Tyson's testimony was not particularly important to the case. When the transcript is read in its entirety, it becomes apparent that this portion of Tyson's testimony did not prejudice defendant. Tyson testified in considerable detail that defendant had beaten him. His testimony was corroborated nearly in full by Mary Caldwell and in part by the neighbor who thought she saw defendant hitting someone. Further support comes from the conduct of defendant himself as testified to by the police officers. Finally, defendant's own version of events was hard to believe. Considered in the context of this evidence, Tyson's challenged statements are insignificant.

### James' Hearsay Statements

Finally, we come to the third challenged statement: James' hearsay statement, as testified to by Officer Reno, that defendant had beaten Mary, Tyson, and James on previous occasions. The record shows that defendant renewed his pretrial objection to James' statements on the basis of hearsay. The record does not

show that defendant objected on the basis of K.S.A. 60-455. Because defendant did not object to these statements on this ground at trial, he may not assert this ground on appeal as a basis for reversal. K.S.A. 60-404; *State v. Garcia*, 233 Kan. 589, 608, 664 P.2d 1343 (1983). And, in any event, even if these statements were erroneously admitted, they were clearly harmless.

### ACCOMPLICE WITNESS INSTRUCTION

Because Mary Caldwell admitted that she helped the defendant beat Tyson, defendant argues that the trial court was required to give the "accomplice witness" instruction set out in PIK Crim. 2d 52.18. That instruction reads as follows:

"An accomplice witness is one who testifies that he was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice."

Defendant admits that he did not request such an instruction at trial, but argues that, under *State v. Anthony*, 242 Kan. 493, 749 P.2d 37 (1988), a trial court is required to give such an instruction regardless of whether it is requested. This argument lacks merit.

The longstanding rule in Kansas is that an accomplice witness instruction must be given when requested by the defense. *State v. Warren*, 230 Kan. 385, 400, 635 P.2d 1236 (1981); *State v. Patterson*, 52 Kan. 335, Syl. ¶ 5, 34 Pac. 784 (1893). In *Anthony*, the Supreme Court held that an accomplice witness instruction may also be given, over the defendant's objections, when re-quested by the prosecution. 242 Kan. at 498-502. The Supreme Court did not hold that there was an independent duty to give such an instruction when neither side requests it. Assuming, without deciding, that Mary Caldwell was an accomplice witness, defendant was not entitled to an accomplice witness instruction because he did not request one.

### DEFENDANT'S SENTENCE

Defendant was convicted of obstructing legal duty, a class E felony. For this offense, the trial court sentenced defendant to a term of 2-5 years. At the time defendant was sentenced, the sentencing statute for class E felonies was ambiguous. It provided that the sentence for class E felonies "shall be an indeterminate term of imprisonment, the minimum of which shall be fixed by

the court at not less than one year and the maximum of which shall be fixed by the court at not less than two years nor more than five years." K.S.A. 1987 Supp. 21-4501(e). Although the legislature intended the minimum to be one year and the maximum to be between two and five years, some courts read this statute as setting the minimum at between one and two years and the maximum at five years. The 1988 legislature amended the sentencing statute to clear up this ambiguity, and it amended K.S.A. 21-4501a(b) to read as follows:

"If an individual has been sentenced to a minimum term of imprisonment of more than one year for a class E felony and the sentence was imposed on or after May 17, 1984, such minimum sentence is hereby reduced to one year."

The State admits that defendant's minimum sentence is illegal and argues only that we should correct the sentence ourselves rather than remanding for resentencing. Because K.S.A. 21-4501a(b) itself corrects defendant's sentence, the correction of defendant's record of sentencing is merely a clerical matter and no sentencing hearing is required. On remand, the trial court is directed to correct the record of defendant's sentence.

Convictions affirmed. Remanded with directions to correct defendant's sentence for obstructing legal duty.