(202 P.3d 68)
No. 97,381

STATE OF KANSAS, *Appellee,* v. STEPHANO A. HERRERA, *Appellant.*

Opinion
filed February 27, 2009.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Kristi L. Barton*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Stephen N. Six*, attorney general, for appellee.

Before ELLIOTT, P.J., GREEN and MARQUARDT, JJ.

GREEN, J.: Stephano A. Herrera was convicted by a jury of aggravated indecent liberties with a child (solicitation), aggravated indecent liberties with a child (lewd fondling), sexual battery, and aggravated criminal sodomy. He was sentenced to 322 months in prison. Stephano sets out a number of issues in his appeal; however, we will address these issues in a different order than they were presented in Stephano's brief. We first consider Stephano's contention that the evidence was insufficient to support his solicitation conviction under K.S.A. 21-3504(a)(3)(B). We agree that the evidence was insufficient and reverse the conviction. Therefore, Stephano cannot be retried on the solicitation charge. Next, Stephano asserts that prosecutorial misconduct deprived him of a fair trial. We agree. As a result, we reverse his sexual battery, aggravated indecent liberties with a child (lewd fondling), and criminal sodomy convictions and remand for a new trial.

Stephano next argues that the trial court improperly admitted evidence of his prior bad acts. We disagree. Next, Stephano argues that the trial court improperly excluded evidence of a witness' disbelief of another witness' accusations. We disagree. Stephano also contends that the trial court's calculation and imposition of his base sentence violated due process. We disagree. Finally, Stephano asserts that his right to a fair trial was prejudiced by cumulative trial errors. Because of our previous rulings in this appeal, we determine that this issue is moot. Accordingly, we reverse and remand for a new trial.

On January 18, 2005, D.H., born on December 30, 1990, wrote a letter, while in school, to her parents alleging that her half-brothers, Raul Herrera, Jr. (also referred to as "Little Roy") and Stephano Herrera, had sexually molested her. D.H. placed the note on the sink of her parents' bathroom, where her mother discovered it that evening. D.H.'s mother showed the letter to D.H.'s father, who then spoke to D.H. about the abuse. According to D.H., she was not comfortable sharing the details with her father and merely confirmed that the abuse had occurred. The following morning, D.H.'s father confronted Stephano and kicked him out of the house.

On January 20, 2005, D.H.'s mother reported the allegations of sexual abuse to a friend, Christine Story, who worked in the Sedgwick County District Attorney's office. Story encouraged D.H.'s mother to visit Story's office and then contacted the Exploited and Missing Child Unit (EMCU) of the police department. After D.H. had begun therapy, the EMCU scheduled an interview with D.H.

Deb Curley conducted the interview of D.H. During the interview, D.H. disclosed that the molestation began with Raul, Jr. when D.H. was in the third grade. D.H. could not recall precisely when Stephano began to molest her but recalled an incident involving Stephano when D.H. was 9 or 10 years old in the fourth grade.

D.H. told Curley that Raul, Jr. and Stephano would independently enter her bedroom in the middle of the night for the ostensible purpose of borrowing a video or a hairbrush but would then touch D.H. inappropriately. Both half-brothers would touch D.H.'s breasts, butt, or "lower part" in similar ways, which made D.H. wonder whether they had talked to each other about the molestation. Stephano's conduct differed in that he frequently pressed D.H. to engage in sex. D.H. always refused Stephano's requests for sex and threatened to tell her parents about the molestation.

D.H. further told Curley that Stephano had touched her "lower part" with his mouth on one occasion, when D.H.'s family was living in the Wyndam Court apartments and D.H. was 13 years old. D.H. had gone to sleep in her room and had awakened because

someone was touching her. She discovered that her pants had been pulled down and that Stephano was straddling her. Before Stephano realized that D.H. had awakened, he slid down to her pubic area and kissed her vagina. D.H. then pushed Stephano away and demanded to know what he thought he was doing. Without responding, Stephano left the room.

D.H. also recounted an incident that had occurred while she was bathing. Stephano had walked into the bathroom, indicating that he needed to use the toilet. D.H. closed the shower curtain on the tub, but Stephano opened the curtain. Stephano's pants were down, and he asked D.H. to perform oral sex on him. When D.H. refused, Stephano stuck his penis into D.H.'s face, brushing her mouth with it.

D.H. told Curley that, as time progressed, Stephano began seeking ways to be alone with D.H., such as providing rides to her dance classes. On the way to class, Stephano would often place his hand inside D.H.'s shirt as he drove. A couple of months before D.H.'s letter, Stephano had become more aggressive, attempting to steer the car with his knees so that he could shift gears with one hand and stick his other hand into D.H.'s pants. D.H. reported that, on one occasion, Stephano had penetrated her vagina with his finger. Because he had long fingernails, he scratched her, and she demanded that he stop.

Just before the reported abuse, Wichita experienced a severe ice storm that knocked out the power to residences. D.H.'s family went to stay with one of her aunts. D.H. slept in the living room on a couch, while her father slept on another couch in the same room. In the morning, D.H. was awakened by the sensation of someone's hand going inside her shirt, but, when she opened her eyes, she saw no one but her father, who was still asleep. Since the abuse had started, D.H. had been dreaming of sexual contact, and she thought perhaps she had just dreamed the sensation of being touched. As she closed her eyes and prepared to return to sleep, however, she again felt a hand slip down her shirt. This time, D.H. sat up and looked around. She saw Stephano running up the stairs.

D.H. told Curley that she had discussed the abuse in general terms with her cousin, V.H., who had stated that Stephano had

touched her inappropriately too. D.H. stated that V.H. had not shared how many times she had been molested.

Based on these allegations, the State charged Stephano with three counts of aggravated indecent liberties with a child involving D.H. in case No. 05 CR 272. Raul, Jr. was also charged with several offenses and ultimately entered a plea agreement with the State.

On March 8, 2005, Detective Bostick conducted a follow-up interview with D.H. While D.H.'s report of the incident during the ice storm was consistent with her earlier account, D.H. made additional allegations against Stephano. With respect to her rides with Stephano to dance class, D.H. stated that Stephano consistently attempted to put his hand in her shorts. She related that, on one occasion, Stephano unzipped his pants, played with himself, and asked D.H. to touch his penis. When she refused, Stephano allegedly grabbed her hand and placed it on his penis, moving her hand up and down on his penis. Stephano then instructed D.H. to take the steering wheel, while he placed his hand under her shirt and bra. In this interview, D.H. alleged that Stephano had touched her private area but denied that he had ever put his finger inside her.

D.H. also told Bostick that one time, when she was in the kitchen eating ice, Stephano asked D.H. to perform oral sex on him. D.H. feigned ignorance about Stephano's suggestion, and, a moment later, Stephano's girlfriend walked into the room. Later, after Stephano's girlfriend had left the house, Stephano came into the living room, pulled down his pants, and masturbated in front of D.H. until he ejaculated.

On July 25, 2005, Stephano moved to dismiss the charges because D.H.'s letter to her parents indicated that the offenses occurred before the dates charged in the complaint. In response, the State filed an amended complaint. The case proceeded to trial but ended in a mistrial when a prosecution witness mentioned that Stephano was arrested when he visited his probation officer.

Before the second trial, V.H., born October 12, 1988, reported her abuse. After D.H. had disclosed the possibility that V.H. had also been abused, the police contacted V.H., who, although admitting to the abuse, refused to discuss it with the police. V.H. stated that she decided to report her abuse when she discovered

that Stephano was denying the allegations D.H. had made. V.H. was interviewed by Curley and Bostick on October 27, 2005.

V.H. reported that she was 11 or 12 years old and in the fifth or sixth grade when Stephano molested her the first time. She was visiting the home of D.H. on Maxwell and was sleeping on the floor in her aunt's bedroom. Sometime at night, Stephano entered the room, put on a condom, pulled down V.H.'s pants, and penetrated her vagina with his penis. Afterward, V.H. went into the adjoining bathroom and noticed that she was bleeding. When she asked Stephano whether it was supposed to bleed, he confirmed that it was but told V.H. not to tell anyone what had happened.

Approximately 3 months later, V.H. was again visiting D.H.'s house. All of the younger cousins were in the living room, where they had fallen asleep while watching the Cartoon Network. Stephano came, woke up V.H., and took her into D.H.'s bedroom. He pulled down her pants, lifted her up, and set her on top of his penis while he was still standing. After he penetrated her vagina once, however, Stephano set V.H. down again because she was too heavy for him to hold while engaging in sex. V.H. took the opportunity to tell Stephano that she did not think that it was a good idea, and she returned to the living room and went back to sleep. Stephano did not disturb her again that evening.

The third incident V.H. reported occurred on Thanksgiving Day 2004. Following dinner, Stephano invited V.H. to go to a movie with him. On the way to the theater, Stephano took V.H.'s hand and placed it outside his clothing in his crotch. After arriving at the theater, V.H. wanted to sit in the middle, but Stephano directed her towards the back of the theater. During the film, he again took V.H.'s hand and placed it outside his clothing in his crotch. V.H. could feel that Stephano had an erection. Stephano told V.H. that he wished she was his girlfriend, but V.H. did not respond.

In the car after the movie, Stephano suggested that V.H. "go down on him," which V.H. understood to mean oral sex. When V.H. declined, Stephano grabbed her head and forced her down into his lap. V.H. began to choke on Stephano's sperm and started to spit it out. Stephano wanted her to swallow rather than spit it

onto him, but V.H. rolled down the window, and Stephano gave her a cup in which to spit.

V.H. reported that Stephano then took her to her mother's house, instead of returning to the family Thanksgiving gathering. They went downstairs to V.H.'s bedroom, and Stephano had V.H. bend over, face down, on the edge of the bed. She told him that she could not have sex because she was on her period, but Stephano replied that he would put "it" somewhere else. He then proceeded to anally sodomize V.H. She wanted him to stop because it was painful, but he continued until he ejaculated. V.H. reported that she did not wish to rejoin her family immediately because she was experiencing pain in her bottom.

Based on these allegations, the State charged Stephano with sexual battery and two counts of aggravated criminal sodomy in case No. 05 CR 2887. The State also sought consolidation of case No. 05 CR 2887 with case No. 05 CR 272 for trial. The trial court granted the motion.

After discovering that V.H. was alleging a break in both the oral sodomy and the anal sodomy, the State amended the complaint in case No. 05 CR 2887 to charge Stephano with sexual battery and four counts of aggravated criminal sodomy. Following several amendments to the complaint, the State ultimately charged Stephano with three counts of aggravated indecent liberties with a child, two counts of aggravated criminal sodomy, and one count of rape in case No. 05 CR 272.

At trial, D.H. and V.H. testified fairly consistently with their accounts during the police interviews, which were played for the jury. In relating her account of Stephano kissing her vagina, D.H. reported that the event occurred at a different location than her earlier account had indicated. In discussing the shower incident, D.H. also provided additional details that she had not previously disclosed. With respect to the alleged digital rape in the car on the way to dance lessons, D.H. testified that she had taken the steering wheel, which was consistent with her statement to Bostick but inconsistent with her statement to Curley. D.H. also testified that Stephano had digitally penetrated her vagina, which was consistent with her statement to Curley but not with the statement to Bostick.

D.H. explained these inconsistencies by testifying that her statements to Bostick related to an incident occurring on the trip home from dance class, while her statements to Curley related to the ride to dance class.

V.H.'s trial testimony differed from her statement to the police in relating the circumstances under which the second rape incident had terminated. At trial, V.H. related that Stephano had let her go when she indicated that she heard someone coming. With respect to the events of Thanksgiving 2004, V.H. indicated at trial that Stephano had forced her to continue to engage in oral sodomy after she had choked and spit out the window. Yet, in her earlier interviews, V.H. had stated that Stephano had made her continue oral sodomy until he ejaculated, which was what caused her to choke. V.H. also testified at trial that, when Stephano was anally sodomizing her, she persuaded him to stop and get some lubricant, which she had not mentioned to the police in her interview.

Stephano's trial defense involved allegations that D.H.'s mother had prompted the alleged victims to fabricate their accounts of sexual abuse to prevent him from reporting her husband's drug activities. In pursuing this defense, Stephano called several witnesses who testified that they had observed drug activities in the household and that D.H.'s mother had a reputation for being dishonest and manipulative. The defense also obtained an admission from D.H.'s aunt that she had been convicted in 1998 of drug trafficking.

Raul, Jr. testified that he had entered a plea of no contest to an act of sexual abuse that had occurred years before the current allegations. Raul, Jr. also stated that the sexual abuse allegations made in this case occurred after he had confronted D.H.'s mother about involving Stephano in the family drug business and had threatened to report the drug activities.

Stephano testified that he had never touched D.H. and V.H. in a sexual manner and had learned of the sexual abuse allegations when his father confronted him about D.H.'s letter. Stephano testified that drug activity was normal for his family and that he grew up around drugs.

Following 2 days of deliberation, the jury acquitted Stephano of all charges except the following: In case No. 05 CR 272, the jury convicted Stephano of Count 1 (aggravated indecent liberties with a child—solicitation) and Count 3 (aggravated indecent liberties with a child—lewd fondling). In case No. 05 CR 2887, the jury convicted Stephano of Count 1 (sexual battery) and Count 3 (aggravated criminal sodomy). The trial court sentenced Stephano to 200 months in prison for the base offense of aggravated criminal sodomy, 61 months in prison for each of the aggravated indecent liberties with a child convictions, and 12 months in jail for the sexual battery conviction. All sentences were ordered to run consecutively except the jail sentence imposed for the sexual battery conviction, producing a controlling sentence of 322 months in prison.

*I. Does the record contain insufficient evidence to support Stephano's conviction under K.S.A. 21-3504(a)(3)(B)?*

Stephano alleges that his conviction for Count 1 of case No. 05 CR 272 was supported by insufficient evidence. When the sufficiency of the evidence is challenged in a criminal case, an appellate court reviews the evidence in a light most favorable to the prosecution to determine whether a rational factfinder was capable of finding the defendant guilty beyond a reasonable doubt. *State v. Gutierrez*, 285 Kan. 332, 336, 172 P.3d 18 (2007).

The challenged conviction is for aggravated indecent liberties with a child, as defined by K.S.A. 21-3504(a)(3)(B). K.S.A. 21-3504(a)(3)(B) states:

"(a) Aggravated indecent liberties with a child is:

. . . .

(3) engaging in any of the following acts with a child who is under 14 years of age:

. . . .

(B) soliciting the child to engage in any lewd fondling or touching of the person of another with the intent to arouse or satisfy the sexual desires of the child, the offender or another."

K.S.A. 21-3504(a)(3)(B) was recently interpreted by our Supreme Court in the context of determining whether aggravated

indecent solicitation of a child under K.S.A. 21-3511(a) was a lesser included offense. *State v. Johnson*, 283 Kan. 649, 653, 156 P.3d 596 (2007).

"As stated previously, K.S.A. 21-3504(a)(3)(B) criminalizes 'soliciting the child to engage in any lewd fondling or touching of the *person of another* with the intent to arouse or satisfy the sexual desires of the *child, the offender or another.*' (Emphasis added.) Notably, the second half of the statute differentiates among (1) the child, (2) the offender, or (3) another. The legislature could have easily written the first part of the statute to include 'fondling or touching of the *offender or another*' but apparently chose not to do so. Similarly, subsection (a)(3)(A) differentiates between 'the person of *either* [1] *the child or* [2] *the offender.*' The plain and unambiguous language of (a)(3)(B)—'person of another'—requires a third party." *Johnson*, 283 Kan. at 654.

Clearly, a conviction under K.S.A. 21-3504(a)(3)(B) requires proof that a criminal defendant solicited a child to engage in lewd fondling or touching of a third party. In this case, there was no evidence that a third party was involved in any of the alleged sexual abuse between Stephano and either of the victims. As specifically related to Count 1 in case No. 05 CR 272, the State presented evidence that Stephano had solicited oral sex from D.H. while she was eating ice in the kitchen. The State presented no evidence that Stephano had solicited D.H. to engage in any activity that might be construed as lewd fondling or touching of any person other than Stephano. Therefore, the evidence was not sufficient to support Stephano's conviction for aggravated indecent liberties with a child, as charged in Count 1 of case No. 05 CR 272.

On appeal, the State concedes that *Johnson* had interpreted K.S.A. 21-3504(a)(3)(B) to require that the solicitation involve fondling or touching of a third party but argues that *Johnson* does not control this case because *Johnson* did not directly address the sufficiency of the evidence. This argument is unpersuasive. As K.S.A. 21-3504(a)(3)(B) had been interpreted by our Supreme Court, the State's evidence was insufficient to support Stephano's conviction for aggravated indecent liberties with a child, as charged in Count 1 of case No. 05 CR 272. As a result, this conviction must be reversed.

Where a conviction is reversed due to insufficient evidence to support the charge and where the evidence presented would support a conviction of a lesser included offense, an appellate court may order a criminal defendant to be resentenced for the lesser included offense. See *State v. Kingsley*, 252 Kan. 761, 782, 851 P.2d 370 (1993). Nevertheless, the State does not suggest a lesser included offense for Stephano's conviction under K.S.A. 21-3504(a)(3)(B). The most obvious candidate for a lesser included offense would be aggravated indecent solicitation of a child under K.S.A. 21-3511(a). Yet, the *Johnson* court has already determined that K.S.A. 21-3511(a) did not meet the elements test for a lesser included offense of K.S.A. 21-3504(a)(3)(B). 283 Kan. at 656. Therefore, we reverse Stephano's conviction on Count 1 of case No. 05 CR 272.

## II. Did prosecutorial misconduct deprive Stephano of a fair trial?

Next, Stephano contends the State committed prosecutorial misconduct in closing arguments by referring to multiple uncharged sexual acts. Specifically, Stephano objects to the following statements:

"[T]his case came to light and it was appropriately and conservatively charged for the sex acts he did and then the second victim also comes forward. You know, mind you he is not charged with the sex acts of what he did to [V.H.] that are outside the statutes of limitations. Mind you, he is not charged with additional sex act [sic] that came to light in [D.H.'s] second March 8th interview. There is one about a trip on the way to dance from April or May of '04 and there is another shower incident when he molested her breasts and her vaginal area. He is charged with what initially came to light and then was later corroborated in the follow-up interview."

Although Stephano failed to object to these statements at trial, appellate courts will review a claim of prosecutorial misconduct for plain error, even in the absence of an objection at trial. *State v. Warledo*, 286 Kan. 927, 947, 190 P.3d 937 (2008).

When a criminal defendant has alleged prosecutorial misconduct, this court applies a two-step review. First, the court considers whether the challenged conduct falls outside the wide latitude a prosecutor is allowed in choosing the language and manner of presentation with which he or she discusses the evidence presented at

trial. Second, if the prosecutor's conduct is deemed to fall outside the permissible bounds of zealous advocacy, the court determines whether the misconduct constituted plain error. Misconduct constitutes plain error when it unfairly prejudices the defendant's ability to obtain a fair trial. *Warledo*, 286 Kan. at 947.

In considering the prejudice part of the analysis, the court examines three factors: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct demonstrates ill will by the prosecutor; and (3) whether the evidence of guilt is so overwhelming that the misconduct would likely have been given little, if any, weight in the minds of the jurors. No one factor is controlling on the question of prejudice, and the third factor may override the first two factors only where the misconduct satisfies both the statutory and constitutional harmless error tests. *Warledo*, 286 Kan. at 947-48.

### A. Were the prosecutor's comments improper?

Stephano argues that the only purpose for discussing the uncharged crimes was to inflame the passions of the jury by suggesting that he had committed many other criminal acts that the State, in its mercy or by operation of law, had not charged and that, regardless of the proof related to the charged offenses, the jury should find Stephano guilty of some crime. In response, the State contends that, because the uncharged sexual acts of Stephano were admitted at trial without objection, the prosecutor was entitled to comment upon the evidence in closing arguments.

Nevertheless, the State's comments upon the uncharged acts misrepresent the facts related to the crimes charged and introduce facts that were not admitted at trial, such as the reasons the State did not charge Stephano with additional offenses. Such commentary is improper and beyond the permissible bounds of closing argument. We recognize that a prosecutor has a wide latitude to explain evidentiary problems and to draw reasonable inferences from the evidence. See *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000). Nevertheless, a deduction may be based only upon evidence which was actually introduced. *State v. Murray*, 285 Kan. 503, 512, 174 P.3d 407 (2008).

Moreover, because the comments emphasize uncharged crimes that, although admitted without objection at trial, tend to indicate the criminal defendant's propensity to commit sex crimes and practically invite the jury to reach a compromise verdict, we cannot deem the comments to be insignificant. Multiple reasons might exist for the State's decision not to charge crimes that have been alleged by a victim, not the least of which is the prosecutor's belief that such crimes are not credible. By offering an explanation for failing to charge such crimes, the prosecutor in this case effectively testified and suggested that, save for the operation of law or the poor memory of a victim, Stephano should be facing an even greater punishment than permitted by the charged offenses. This argument was improper. See *State v. Correll*, 25 Kan. App. 2d 770, 775-76, 973 P.2d 197 (1998) (The court warned that a prosecutor's closing argument implying that he had personal knowledge of other crimes committed by defendant not before the jury should be avoided on retrial.).

In addition, it was clearly improper for the prosecutor to go outside the record and tell the jury that Stephano was responsible for more crimes than just the offenses charged in the complaint. See *Melton v. State*, 713 S.W.2d 107, 114 (Tex. Crim. 1986) (Reversal was required when the prosecutor suggested that the defendants were responsible for the theft of over 300 pieces of heavy equipment other than those which the defendant had been charged with stealing.); see also *Noel v. State*, 754 P.2d 280 (Alaska App. 1988) (The prosecutor improperly implied that the defendant was guilty of a more serious offense than that for which he had been charged.).

### B. Did the prosecutor's comments unfairly prejudice Stephano?

### 1. Were the prosecutor's comments gross and flagrant?

Because we have determined that the prosecutor's comments were improper, we now proceed to the three factors under the second step of the prosecutorial analysis. Considering the first factor, whether the misconduct was gross and flagrant, we determine that the State intentionally attempted to taint the trial process with the improper argument that the State was barred by law from

charging Stephano with other crimes that he probably committed against V.H. and that it had been lenient in not charging him with all the crimes allegedly committed against D.H. Based on the record, we determine that the prosecutor's misconduct was gross and flagrant.

## 2. *Did the prosecutor's comments demonstrate ill will?*

Next, we must consider whether the misconduct shows ill will by the prosecutor. Ill will has been described as "indifference to a court's rulings, mocking of a defendant, or repeated acts of misconduct." *State v. Bunyard*, 281 Kan. 392, 407, 133 P.3d 14 (2006). Here, while the challenged comments represent a small segment of the prosecutor's closing argument, this was not the only act of misconduct by the prosecutor in her closing argument. Specifically, the prosecutor attempted to bolster D.H.'s credibility when she argued as follows:

"Who will you find credible? [D.H.] or [V.H.] or Little Roy, who stands in the unique position of being convicted for the same kind of crime. We know that Little Roy did molest her. We know that [D.H.] was truthful about this because he pled to it. How much more credibility does that give [D.H.] when she describes the molest [sic] in such detail? His conviction reaffirms [D.H.]'s credibility about all the molests [sic]."

The prosecutor's argument was based on a classic non sequitur: Little Roy pled to the crimes charged against him; therefore, D.H. must be telling the truth about the incidents with Stephano. The fact that Little Roy pled no contest in a separate criminal case to sexual acts against D.H. does not necessarily mean that Stephano committed the incidents against D.H. Little Roy's no contest plea was based on discrete criminal acts that were committed separately from the acts charged in the instant case. The prosecutor's use of Little Roy's plea to bolster the credibility of D.H. was improper.

Throughout her closing arguments, the prosecutor recognized that the State's entire case rested on credibility, and she repeatedly made improper arguments which could influence the jury's credibility determination. The prosecutor's repeated misconduct, which included the improper comments concerning the uncharged

crimes against D.H. and V.H. and the improper bolstering of D.H.'s credibility, showed ill will by the prosecutor.

### 3. Was the evidence overwhelming against Stephano?

With regard to the third factor, whether the evidence of guilt was overwhelming, we note that the evidence against Stephano consisted of V.H.'s and D.H.'s accusations against him. There were no other witnesses to the abuse, and there was no physical evidence of the abuse. As a result, the jury's verdict was based entirely upon a credibility determination between Stephano and V.H. and D.H. The jury obviously did not find V.H.'s and D.H.'s accusations credible for at least part of the charges, as Stephano was acquitted of one count of aggravated indecent liberties with a child, two counts of aggravated sodomy, one count of rape against D.H., and three counts of aggravated criminal sodomy against V.H. Based on the record in this case, we cannot say that the evidence was so overwhelming that the prosecutor's comments would likely have been given little, if any, weight in the minds of the jurors.

When analyzing the prejudicial nature of the prosecutor's improper comments, this court is constrained to examine the comments in the context of the trial record as a whole. See *Warledo*, 286 Kan. at 948. As related to the uncharged offenses against D.H., the prosecutor's comments indicated that D.H. changed her story between her two police interviews and that the State charged only those acts that D.H. consistently mentioned. Such statements tend to lend credibility to D.H.'s testimony related to the charged offenses and suggest that the prosecutor had been lenient in charging Stephano with the crimes against D.H. Obviously, the jury did not find D.H. entirely credible in this case. The prosecutor's comments could have influenced the jury to reach a compromise verdict and find Stephano guilty as to some of the crimes charged against him. As a result, we determine that the prosecutor's comments did not constitute harmless error and that Stephano's right to a fair trial was unfairly prejudiced in case No. 05 CR 272.

With respect to Stephano's convictions in case No. 05 CR 2887, the prosecutor's comments present two problems: (1) the comments suggest that Stephano committed other crimes that could

have been proved by the prosecution but were barred by operation of law; and (2) the nature of the jury's verdict with respect to the crimes against V.H. suggests the possibility of a compromise verdict.

As with the offenses charged in case No. 05 CR 272, the jury split its verdict with respect to the offenses charged in case No. 05 CR 2887 involving V.H. The jury convicted the defendant of sexual battery and only one of the four counts of aggravated criminal sodomy charged in the case. Unlike the offenses alleged by D.H., however, all of the charged offenses pertaining to V.H. related to the events on Thanksgiving 2004. The only evidence supporting any of these crimes was the testimony of V.H.

As a result, the jury's verdict turned entirely upon a credibility determination between V.H. and Stephano. Clearly, the jury did not find V.H.'s testimony regarding several of the alleged acts to be credible, but, according to the verdict, the jury found V.H. credible as to one count of oral sodomy. It is evident that the jury's determination was influenced by the inconsistencies in V.H.'s accounts in that it convicted Stephano only on the one count that was supported by consistent testimony of V.H. Nevertheless, because the evidence against Stephano was not strong, the implication created by the challenged prosecutorial comments is sufficient to undermine confidence in the jury's verdict. The natural implication of the prosecutor's statements that the statute of limitations prevented the State from charging Stephano with two additional sex crimes is that Stephano was guilty of those crimes. As a result, the jury might have reached a compromise on the verdict, not being convinced of V.H.'s credibility with respect to the alleged sodomy charges, but believing Stephano had committed some sex crimes against V.H. for which he was not charged and convicting him on that basis.

The prosecutor's comments concerning the uncharged crimes against V.H. suggested to the jury that the State had been prevented from charging Stephano with crimes that he had committed. Under such circumstances, the prosecutorial misconduct cannot be deemed harmless. See *Warledo*, 286 Kan. at 948. Consequently, we reverse Stephano's convictions for sexual battery

and aggravated criminal sodomy in case No. 05 CR 2887 and his conviction for aggravated indecent liberties with a child (Count 3) in Case No. 05 CR 272 and remand for a new trial on those counts.

*III. Did the trial court improperly admit evidence of Stephano's prior bad acts?*

Next, Stephano challenges the admission of evidence related to several uncharged acts of sexual abuse against each of the victims. Specifically, Stephano contends that he was prejudiced by D.H.'s testimony that he had repeatedly solicited inappropriate sexual contact and by V.H.'s description of two uncharged acts of rape. Although we are reversing Stephano's convictions in this case, we will briefly address Stephano's argument because the question posed by the appellant is a recurring one and may present itself again at Stephano's new trial.

Stephano admits that his trial counsel did not object to the admission of this evidence. To preserve for appeal an issue related to the admissibility of evidence, a party must make a timely and specific objection to the admission of such evidence. K.S.A. 60-404; *State v. Cook*, 286 Kan. 1098, 1109, 191 P.3d 294 (2008) (refusing to review a claim that prior crimes evidence was erroneously admitted when the defendant failed to object to the admission of such evidence except within his motion for new trial after the jury had already considered the evidence). See also *State v. Francis*, 282 Kan. 120, 138, 145 P.3d 48 (2006) (where defendant failed to object at trial to the admission of evidence under K.S.A. 60-455, he was precluded from raising the issue on appeal); *State v. Young*, 14 Kan. App. 2d 21, 37, 784 P.2d 366, *rev. denied* 245 Kan. 788 (1989) (To preserve a K.S.A. 60-455 issue for appeal, a defendant must object on that ground at trial.). Here, Stephano has not even indicated that he attempted to limit the State's use of the objectionable evidence by filing a motion in limine before trial. As a result, we determine that Stephano has failed to preserve this issue for appeal.

Admittedly, this court has considered issues raised for the first time on appeal: (1) when the new issue involves only a question of law arising on proved or admitted facts and resolution of the issue

is finally determinative of the case, (2) when consideration of the issue is necessary to prevent the denial of fundamental rights and to serve the ends of justice, or (3) when the judgment of the district court may be upheld despite its reliance on erroneous reasoning. *State v. Hawkins*, 285 Kan. 842, 845, 176 P.3d 174 (2008). Nevertheless, Stephano has made no attempt to characterize this evidentiary issue as an issue deserving of consideration for the first time on appeal. Therefore, we determine that Stephano's argument fails.

*IV. Did the trial court improperly exclude evidence of a witness' disbelief of another witness' accusations?*

Stephano next maintains that the trial court erroneously excluded evidence intended to impeach the testimony of V.H. Although we are reversing Stephano's convictions in this case, we include our analysis on this issue as the question may present itself again at Stephano's new trial.

At trial, Raul, Jr. testified on behalf of the defense and told of a visit he received by V.H. after D.H. had reported the sexual abuse by Raul, Jr. and Stephano. Prompted by questioning by defense counsel, Raul, Jr. initially stated, "We sat there and we were just talking at first, you know, just talking about random things and she [V.H.] told me she didn't believe what [D.H.] had said and she didn't believe none of it." Later, Raul, Jr. clarified, "We were sitting there and she brought up what was being said with me and [V.H.] brought up what was being said about me and she told me she didn't believe what was being—".

The State objected to the testimony because it called for a witness' opinion about the credibility of another witness, and the trial court sustained the objection. Defense counsel made no attempt to offer an alternative use for the evidence or to challenge the trial court's ruling, perhaps relying on the possibility that the testimony would remain within the collective consciousness of the jury despite the State's objection.

On appeal, Stephano concedes that the evidence was inadmissible as a comment on the credibility of D.H. but argues that the trial court should have admitted the evidence as impeachment of

V.H.'s allegations of sexual abuse against Stephano. Essentially, Stephano requests this court to find reversible error in the exclusion of evidence when the court was never asked to consider an alternate basis for admission of the evidence.

Because the admission of evidence that is permissible for a particular use and impermissible for another use depends heavily upon the trial court's assessment of the probative value of the evidence when weighed against its potential prejudice, this evidentiary determination is left to the sound discretion of the district court. See *State v. Reid*, 286 Kan. 494, 504, 186 P.3d 713 (2008). Moreover, it is apparent that Stephano failed to lay a proper foundation to admit Raul, Jr.'s testimony about V.H.'s earlier oral statement— not believing the allegations made by D.H.—as a possible prior inconsistent statement. "The proponent of a particular kind of evidence, whether it be a physical object or the testimony of a witness, is required to lay a foundation before it may be admitted into evidence." 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Evidence § 1:9, p. 24 (5th ed. 2007).

For example, before extrinsic evidence of a previous inconsistent statement is admissible, it is generally required that a foundation be laid by asking the witness on cross-examination to admit or deny the making of the impeaching statement. K.S.A. 60-422(b). If the witness admits making the inconsistent statement, the impeachment has been accomplished and extrinsic evidence is ordinarily not necessary. *State v. Schlicher*, 230 Kan. 482, 492-93, 639 P.2d 467 (1982). On the other hand, if the witness is given an opportunity to identify, explain, or deny the statement, the extrinsic evidence must be admitted where the witness denies making the statement or testifies that he or she cannot remember making the statement. 230 Kan. at 493. Here, the record shows that Stephano neglected to lay a proper foundation for the admission of Raul, Jr.'s testimony. As a result, Stephano's argument fails.

V. *Did the calculation and imposition of Stephano's sentence violate due process?*

Although Stephano divides his argument into two separate issues, the two issues challenge the sentence imposed for Stephano's

base offense as a violation of due process. Citing *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), Stephano first contends that the trial court unconstitutionally considered the facts of Stephano's prior criminal convictions to calculate his base sentence without a jury finding that the prior convictions existed. Stephano further argues that the holding of *Apprendi* extends to the imposition of the aggravated sentence within the appropriate sentencing grid box under the United States Supreme Court's ruling in *Cunningham v. California*, 549 U.S. 270, 166 L. Ed. 2d 856, 127 S. Ct. 856 (2007). Although we are reversing Stephano's convictions, we include our analysis on this issue as it may become relevant if Stephano is convicted at a new trial.

Both arguments are controlled by decisions of our Supreme Court. See *State v. Johnson*, 286 Kan. 824, 851, 190 P.3d 207 (2008) (ruling that the statutory maximum penalty imposed for a given crime is the aggravated sentence within the appropriate grid box and imposition of such sentence with a jury finding does not violate due process); *State v. Ivory*, 273 Kan. 44, 46-47, 41 P.3d 781 (2002) (ruling that the holding of *Apprendi* does not extend to calculation of a defendant's criminal history score under the Kansas Sentencing Guidelines Act).

This court is bound to apply our Supreme Court precedent absent some indication that the court is departing from such precedent. *State v. Merrills*, 37 Kan. App. 2d 81, 83, 149 P.3d 869, *rev. denied* 284 Kan. 949 (2007). Our Supreme Court has recently affirmed its reasoning in both *Johnson* and *Ivory*. See *State v. Baker*, 287 Kan. 345, 371, 197 P.3d 421 (2008); *Warledo*, 286 Kan. at 954. Consequently, these arguments provide no basis for relief.

## VI. *Was Stephano's right to a fair trial prejudiced by cumulative trial error?*

Finally, Stephano contends that the cumulative effect of the errors committed during his trial deprived him of a fair trial.

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial.

No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant." *State v. Ackward,* 281 Kan. 2, 29, 128 P.3d 382 (2006).

The errors considered prejudicial enough to mandate reversal of Stephano's convictions render this issue moot. See *State v. Aleman,* 16 Kan. App. 2d 784, 786, 830 P.2d 64, *rev. denied* 251 Kan. 940 (1992) ("An appellate court will not render opinions in appeals which present moot issues or where the judgment could have no practical effect on a then-existing controversy.").

Reversed and remanded for a new trial.